## UNITED STATES *v.* BOARD OF COUNTY COM-MISSIONERS OF OSAGE COUNTY, OKLAHOMA, ET AL.

### APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 309. Argued April 16, 1919.—Decided December 15, 1919.

As the guardian of non-competent Osage Indians, whose surplus allotments are submitted to state taxation, under the Act of June 28, 1906, c. 3572, 34 Stat. 539, the United States may maintain a suit to protect such allottees as a class from being despoiled of their property through arbitrary, excessive and discriminating taxes, imposed upon them by the state tax officials in systematic and intentional disregard of the state laws. P. 132.

The proper officials of the United States (the United States Attorney under direction of the Attorney General) have implied authority to institute and conduct such a suit; and this is recognized by the Act of March 2, 1917, c. 146, 39 Stat. 969, 983, providing for an appraisement of the lands to ascertain the extent of over-assessment. *Id.*

In such a case the United States is not obliged to resort to the remedies afforded to individuals by the state law for the correction of mistakes committed in the tax proceedings, but may invoke the equity jurisdiction to avoid a multiplicity of suits, and secure an adequate remedy for the Indians as a class. P. 133.

254 Fed. Rep. 570, reversed.

THE case is stated in the opinion.

*Mr. Leslie C. Garnett*, with whom *The Solicitor General* was on the brief, for the United States.

*Mr. Preston A. Shinn*, with whom *Mr. Corbett Cornett* was on the brief, for appellees.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

Although the subject was fully stated in *McCurdy* v. *United States*, 246 U. S. 263, nevertheless to throw light on this case, we recall the facts concerning the distribution of the land and funds of the Osage Tribe of Indians made under the Act of Congress of June 28, 1906, c. 3572, 34 Stat. 539.

Of the tribal land there were reserved from allotment certain parcels, some of which were used by the United States or the tribe and others of which were used by individuals for the benefit of the tribe. From the remainder, each member was allotted three tracts of 160 acres each, of which one was to be designated and held as a homestead. Any land which remained was also to be allotted. The funds in trust in the hands of the United States were divided pro rata, to be held subject to the supervision of the United States. The oil, gas, coal, and other mineral rights in all the lands were reserved for the benefit of the tribe. The tract selected as a homestead was made inalienable and non-taxable, subject to the action of Congress. The land embraced by other than the homestead allotment, called surplus land, was made inalienable for a period of twenty-five years and non-taxable for three, subject to the action of Congress. Power was conferred, however, on the Secretary of the Interior to give to the allottee a certificate of competency, upon receipt of which the surplus land held by such an allottee became immediately alienable and taxable.

In September, 1917, the United States District Attorney for the Western District of Oklahoma, by direction of the Attorney General, commenced this suit in the name of the United States, for the benefit of named non-competent members of the Osage Tribe and of all other mem-

bers in the same situation, to prevent the enforcement of
state and local taxes assessed against the surplus, al-
though taxable, lands of said Indians for the eight years
between 1910 and 1917 inclusive.

The defendants were the Board of County Commis-
sioners of Osage County, including the county clerk
and county treasurer, officials charged by the laws of
the State with the enforcement of the taxes which were
assailed. After averring the existence of authority in
the United States, in virtue of its guardianship of the
Indians and as a result of the terms of the allotment
act, to protect and safeguard the interests of the Indians
from the enforcement of the illegal taxes complained of,
the bill charged that the taxes in issue were "arbitrary,
grossly excessive, discriminatory, and unfair, and were
made in violation of the rights of the said Osage Indians
guaranteed by the Constitution of the United States
and the constitution of the State of Oklahoma; . . .
that the State Board of Equalization . . . arbitrarily
and systematically increased the assessments on Osage
Indian lands for the year 1911 to an amount approxi-
mately nearly double the original amount of such assess-
ments. . . ." It was averred that the tax assessments
made on the Indian lands involved "were made without
an inspection or examination of the land . . .; that
the said appraisers in making said appraisements dis-
criminated against the lands of the Osage Indians as a
class and systematically overvalued the same and sys-
tematically undervalued other property in said County;
. . . that the assessments so made by said assessors
were made in such an arbitrary and capricious manner
as to amount to constructive fraud upon the taxpayers,
and that the overvaluations made by said assessors
were so grossly excessive as to justify the interference of
a court of equity. . . ." It was alleged that the as-
sessments complained of were of such a character that the

Secretary of the Interior had endeavored to have them corrected, but without result; that, in consequence of his having called the attention of Congress to the subject, the Act of March 2, 1917, c. 146, 39 Stat. 969, 983, was passed authorizing an appraisement by the said Secretary for the purpose of fixing the extent of the overassessment and that such appraisement, which had been virtually completed, sustained the charges set forth in the bill.

There was annexed to the bill a statement of the result of the appraisement in 36 cases as compared with the assessments complained of. In one case it was alleged that the land of the Indian was assessed at $20 an acre, although by the affidavit of the county clerk it was shown that it was worth $3 per acre. In another case it was alleged that, for the purpose of taxation, the land was shown to be overvalued by 119 per cent. It was further averred that an offer had been made through the Secretary of the Interior to pay all the taxes assessed for all the years assailed upon the basis of the assessment made as the result of the act of Congress, but that the same had been refused, and that process for the sale of the lands for delinquent taxes was immediately threatened. The prayer was for relief by injunction as against the illegal assessments and for action by the court looking to a payment of all delinquent taxes due by non-competent Osage Indians on the basis of the appraisement made under the act of Congress.

On motion the court dismissed the bill on the ground "that the lands involved were by Act of Congress, approved June 28, 1906, declared subject to taxation, and that the plaintiff has no interest in said lands, and has no duty or authority to contest the taxes thereon, or the sale of said lands for unpaid taxes. . . ." On appeal the decree was affirmed on the ground that as the state law afforded adequate means to the United States and the noncompetent Indians to correct errors in assessing

taxes, if any, there was no basis for invoking relief from a court of equity.

The argument here is exclusively directed to two grounds, the one enforced by the trial court and the other sustained by the court below. The first, however, is in argument here expanded into two points of view, since it challenges not only the authority of the officers of the United States to bring the suit, but the power of the United States to authorize them to do it. So far as the latter aspect is concerned, it proceeds upon the assumption that by the Act of 1906 the United States exhausted its power as the protector and guardian of the Osage Indians and as to them had no longer any mission or authority whatever. We pass from this contention without further notice, as it is so obviously opposed to the doctrine upon the subject settled from the beginning and so in conflict with the terms of the act of Congress that nothing more need to be said concerning it. As to the first point of view, the proposition is this: That as the Act of 1906 subjected the surplus lands to taxation, it therefore brought them under the taxing laws of the State, and, it is insisted, that having been so brought, it results that until Congress otherwise provides there exists no lawful authority in an officer of the United States to act in the name of the United States for the purpose of attacking the legality of a tax levied upon said lands under the laws of the State. But although the premise upon which the argument proceeds be admitted, that is, that in subjecting the lands to state taxation it was the purpose of Congress to subject them to the methods of levying and collecting the taxes provided by state law, including the remedial processes for the correction of errors, we fail to understand what relation that concession can have to the case in hand, since on the face of the pleadings the action taken by the United States was not to frustrate the act of Congress by preventing the operation of the state

law, but to prevent the systematic violation of the state law committed for the purpose of destroying the rights created by the act of Congress. The argument therefore disregards the foundation for the relief sought and proceeds upon the assumption that the exertion of power to prevent a perversion of state laws made to defeat the rights which the act of Congress gave is to be treated as a violation of the act of Congress and a refusal to apply the state law.

Certain is it that as the United States as guardian of the Indians had the duty to protect them from spoliation and, therefore, the right to prevent their being illegally deprived of the property rights conferred under the Act of Congress of 1906, the power existed in the officers of the United States to invoke relief for the accomplishment of the purpose stated. Indeed the Act of Congress of 1917, providing for the appraisement of the lands in question, by necessary implication, if not in express terms, treated the power of the officers of the United States to resist the illegal assessments as undoubted.

And the existence of power in the United States to sue which is thus established disposes of the proposition that because of remedies afforded to individuals under the state law the authority of a court of equity could not be invoked by the United States. This necessarily follows because, in the first place, as the authority of the United States extended to all the non-competent members of the tribe it· obviously resulted that the interposition of a court of equity to prevent the wrong complained of was essential in order to avoid a multiplicity of suits (see *Union Pacific Ry. Co.* v. *Cheyenne,* 113 U. S. 516; *Smyth* v. *Ames,* 169 U. S. 466; 517; *Cruickshank* v. *Bidwell,* 176 U. S. 73, 81; *Boise Artesian Water Co.* v. *Boise City,* 213 U. S. 276, 283; *Greene* v. *Louisville & Interurban R. R. Co.,* 244 U. S. 499, 500); in the second place because, as the wrong relied upon was not a mere mistake or error

committed in the enforcement of the state tax laws, but a systematic and intentional disregard of such laws by the state officers for the purpose of destroying the rights of the whole class of non-competent Indians who were subject to the protection of the United States, it follows that such class wrong and disregard of the state statute gave rise to the right to invoke the interposition of a court of equity in order that an adequate remedy might be afforded. *Cummings* v. *National Bank*, 101 U. S. 153; *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 390; *Pittsburgh, etc., Ry. Co.* v. *Backus*, 154 U. S. 421; *Coulter* v. *Louisville & Nashville R. R. Co.*, 196 U. S. 599; *Raymond* v. *Chicago Union Traction Co.*, 207 U. S. 20; *Greene* v. *Louisville & Interurban R. R. Co.*, 244 U. S. 499, 507. In fact the subject is fully covered by the ruling in *Union Pacific R. R. Co.* v. *Weld County*, 247 U. S. 282.

*Reversed and remanded for further proceedings in conformity with this opinion.*