**NE-KAH-WAH-SHE-TUN-KAH et al. v. FALL, Secretary of the Interior, et al.**

(Court of Appeals of District of Columbia. Submitted February 14, 1923. Decided June 4, 1923.)

No. 3871.

Indians ⬅️23—Act of 1906, governing disposition of Osage tribal funds, did not exhaust powers of Congress.

    Act June 28, 1906, as amended by Act April 18, 1912, section 4 of which provided for the disposition of the funds of the Osage Tribe of Indians to the individual members of the tribe in the manner therein prescribed, did not exhaust the power of Congress, in discharge of the nation's duty of guardianship, to prescribe the method of disposing of those funds, so

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

that Act March 3, 1921, requiring a portion of the share of the income of incompetent Indians not under guardianship to be withheld and invested for them, was valid.

Appeal from the Supreme Court of the District of Columbia.

Suit for injunction by Ne-kah-wah-she-tun-kah and others against Albert B. Fall, Secretary of the Interior, and another. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

S. C. Peelle and C. F. R. Ogilby, both of Washington, D. C., and Preston A. Shinn, of Pawhuska, Okl., for appellants.

Peyton Gordon, C. E. Wright, and E. S. Booth, all of Washington, D. C., for appellees.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and BARBER, Judge of the United States Court of Customs Appeals.

ROBB, Associate Justice. Appeal from a decree in the Supreme Court of the District dismissing appellants' bill, in which was sought an injunction restraining appellees from carrying out certain provisions of the Act of March 3, 1921 (41 Stat. 1249); the contention of appellants being that these provisions amount to an unconstitutional invasion of their rights as full-blood incompetent members of the Osage Tribe of Indians. The bill was disposed of on motion to dismiss, and the real question for determination is whether Congress, by the Act of June 28, 1906 (34 Stat. 539), as amended by the Act of April 18, 1912 (37 Stat. 86), had exhausted its power to control the payment of income to such incompetent Indians.

Section 4 of the act of 1906 in part provides:

"That all the funds of the Osage Tribe of Indians, and all the moneys now due or that may hereafter be found to be due to the said Osage Tribe of Indians, and all the moneys that may be received from the sale of their lands in Kansas under existing laws, and all moneys found to be due to said Osage Tribe of Indians on claims against the United States, after all proper expenses are paid, shall be segregated as soon after January first, nineteen hundred and seven, as is practicable and placed to the credit of the individual members of the said Osage Tribe on a basis of a pro rata division among the members of said tribe, as shown by the authorized roll of membership as herein provided for, or to their heirs as hereinafter provided. * * *"

It thus appears that the funds to which this section refers are tribal funds, and that in 1906 it was the will of Congress that these funds should be paid in a certain way to the individual members of the tribe. Between 1906 and 1921 the volume of the funds in question had materially increased (see Payne v. U. S., 50 App. D. C. 219, 269 Fed. 871; Work v. U. S., 43 Sup. Ct. 389, 67 L. Ed. ——; decided by the Supreme Court of the United States March 19, 1923), and this fact probably accounts for the enactment of the act of 1921, under section 4 of which it is provided:

"That from and after the passage of this act the Secretary of the Interior shall cause to be paid at the end of each fiscal quarter to each adult member of the Osage Tribe having a certificate of competency his or her pro rata share, either as a member of the tribe or heir of a deceased member, of the interest on trust funds, the bonus received from the sale of leases, and the roy-

alties received during the previous fiscal quarter, and so long as the income is sufficient to pay to the adult members of said tribe not having a certificate of competency $1,000 quarterly except where incompetent adult members have legal guardians, in which case the income of such incompetents shall be paid to their legal guardians, * * * and to invest the remainder after paying all the taxes of such members either in United States bonds or in Oklahoma state, county, or school bonds, or place the same on time deposits at interest in banks in the state of Oklahoma for the benefit of each individual member under such rules and regulations as the Secretary of the Interior may prescribe. * * *"

In United States v. Osage County, 251 U. S. 128, 40 Sup. Ct. 100, 64 L. Ed. 184, the power of the United States to authorize the guardian of a noncompetent Osage Indian to maintain a suit to protect him from discriminating taxes was challenged. The court, meeting this contention, said:

"It proceeds upon the assumption that by the act of 1906 the United States exhausted its power as the protector and guardian of the Osage Indians and as to them had no longer any mission or authority whatever. We pass from this contention without further notice, as it is so obviously opposed to the doctrine upon the subject settled from the beginning and so in conflict with the terms of the act of Congress that nothing more need be said concerning it."

In Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. Ed. 591, it appeared that under the Supplemental Agreement with the Choctaws and Chickasaws of July 1, 1902 (32 Stat. 641), a homestead allotment of a full-blood Choctaw became free from the restrictions imposed at the death of the allottee, and the heir of the allottee, though a full-blood, might alienate the land without approval of the conveyance by the Secretary of the Interior, but under the Act of April 26, 1906 (34 Stat. 137), the right in such a case again was restricted so that the full-blood heir was without power to convey without the approval of the Secretary. The court said:

"Notwithstanding Rachel James might have conveyed the homestead allotment after it descended to her, she was a tribal Indian, and as such still subject to the legislation of Congress enacted in discharge of the nation's duty of guardianship over the Indians. Congress was itself the judge of the necessity of legislation for this purpose; it alone might determine when this guardianship should cease. * * * In view of the repeated decisions of this court, we can have no doubt of the constitutionality of such legislation. While the tribal relation existed, the national guardianship continued, and included authority to make limitations upon the rights which such Indians might exercise in respect to such lands as are here involved. This authority did not terminate with the expiration of the limitation upon the rights to dispose of allotted lands; the right and duty of Congress to safeguard the rights of Indians still continued. It has been frequently held by this court that the grant of citizenship is not inconsistent with the right of Congress to continue to exercise this authority by legislation deemed adequate to that end."

In view of the foregoing decisions, we see no escape from the conclusion that in enacting the legislation here in question Congress was well within its constitutional authority. The funds to which these statutes relate were derived from tribal sources, and Congress has merely prescribed the conditions under which payment shall be made to certain classes of Indians. The property of those Indians is not diverted, their title to it is undisturbed, and the provisions with reference to its payment are reasonable. We agree with the trial

court that the bill should be dismissed, and therefore affirm the decree, with costs.

Affirmed.

Petition for appeal to the Supreme Court of the United States granted August 6, 1923.