## UNITED STATES v. BOARD OF COUNTY COMMISSIONERS OF OSAGE COUNTY et al.

(Circuit Court of Appeals, Eighth Circuit. September 9, 1924.)

No. 6569.

1. **Judgment** &⟶714(1)—**Judgment sustaining validity of assessment for one year held not conclusive as to subsequent years.**

A judgment determining the validity of tax assessments on lands for a certain year, though conclusive between the parties as to such year, *held* not conclusive of the validity of assessments made in subsequent years, though alleged to be "substantially" the same, where they were not identical and in some cases varied widely from the assessment for the year adjudicated.

2. **Taxation** &⟶608(5)—**Jurisdiction of equity to enjoin collection of taxes.**

To authorize the granting of an injunction by a court of equity to restrain the collection of taxes on the ground that assessment of the property was excessive, it is incumbent on complainant to establish, not only that the assessment was in fact excessive, either actually or in comparison with other property, but also that it was so made intentionally by the taxing officers for the purpose of discriminating between taxpayers.

3. **Taxation** &⟶611(6)—**Assessment of Indian lands held not shown to be illegal, as excessive.**

Evidence *held* not to sustain the claim that the officers of an Oklahoma county intentionally and systematically overvalued the lands of noncompetent Osage Indians for taxation, either by assessing them at more than their fair actual value, or at a value comparatively greater than that at which other property was assessed.

Appeal from the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Suit in equity by the United States against the Board of County Commissioners of Osage County, Okl., and others. Decree for defendants, and complainant appeals. Affirmed.

S. W. Williams, Sp. Asst. Atty. Gen., for appellant.

Preston A. Shinn, of Pawhuska, Okl., for appellees.

Before SANBORN and LEWIS, Circuit Judges, and FARIS, District Judge.

LEWIS, Circuit Judge. This suit was brought to restrain the collection of state, county and other taxes levied on lands of non-competent Osage Indians in Osage County, Oklahoma, for the years 1910 to 1917, both inclusive, and to enjoin sales of those lands for taxes and issuance of tax deeds. The bill was filed in September, 1917. As ground for the relief sought it alleged that the taxes were unfair, discriminatory and excessive because the tax officials of that county, in making assessments for each year, had systematically, intentionally, arbitrarily and capriciously over-valued those lands and under-valued other lands and town lots. It was dismissed on demurrer, then brought here, the judgment of dismissal affirmed by this court, 254 Fed. 570, 166 C. C. A. 128, then taken to the Supreme Court and the bill there sustained in an opinion rendered on December 15, 1919. 251 U. S. 128, 40 Sup. Ct. 100, 64 L. Ed. 184. When the case got back to the trial court an appraisement had been made pursuant

to the Act of March 2, 1917 (39 Stat. 983), of 697,301 acres belonging to 1551 non-competent Indians. That fact was brought in by an amendment to the bill filed November 28, 1921; and in that connection it was averred that expert accountants had tabulated in schedules the valuations made by the Federal appraisers, the valuations made by the tax officials for purposes of taxation, that the schedules showed the amounts of taxes against each tract for each year according to the two valuations, that the schedules also showed that $791,434.66 had been paid in taxes, penalties and costs, that the taxes unpaid as assessed against the remainder of the lands amounted to $175,607.15, but that the total amounts paid exceeded by $311,421.02 the total amount of taxes against all the lands, if the assessments had been made on the valuations found by the Federal appraisers. As a matter of fact Government Exhibit 4 shows unpaid taxes, exclusive of penalties, amounted to $114,964.88 when the exhibit was made up. That exhibit also shows that the total tax levies for the eight years amounted to $750,369.44, whereas if computed on the Federal appraisement they would have been $480,013.64. It was averred in the amendment that the valuations made by the Federal appraisers pursuant to the Act of March 2, 1917, was the true cash value of the different tracts. The State Constitution provides:

"All property which may be taxed ad valorem shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale." Article 10, § 9.

The accountants' schedules were made exhibits and part of the amendment by reference, and it was prayed in the amendment "* * * that all taxes assessed and levied against said lands, for the years 1910 to 1917, inclusive, in excess of the taxes based on the Federal appraisement be decreed to be illegal and that the tax based on the Federal appraisement be decreed to be the correct tax for the said years. * * * that all sales of said lands for taxes for the years 1910 to 1917, inclusive, where the said Accountant's Schedule 'A' shows the assessment to be in excess of the Federal appraisement, be decreed to be illegal and canceled."

Continuing: "The plaintiff further prays for a decree directing the county authorities to repay to it for the benefit of the Indians the sum of $311,421.02 and such further sums as may be shown to have been paid by or in behalf of the Indians since the said Accountant's Schedule 'A' was compiled; that all unpaid taxes assessed and levied against said lands be decreed to be paid and canceled; and that the defendants be forever enjoined and restrained from collecting any further taxes on any of said lands for the years 1910 to 1917, inclusive."

Other facts were stated in the bill, to the effect that statutory requirements were not observed in some of the earlier years in making assessments, levies and preparation of the assessment rolls and certificates thereto; but some of the omissions, if neglected, were not mandatory requirements, but directory, and they were not fatal. Garfield County v. Field, 63 Okl. 80, 162 Pac. 733. Others are not now relied on. Furthermore, this is a suit in equity, the taxpayer must do equity, the lands were all subject to taxation for each of the years and the plaintiff offers in the bill to pay the fair and just amounts of taxes for each year against each tract as a necessary condition of its right to obtain a cancellation of that part of the levy which it charges as being unfair and excessive. Raymond v. Traction Co., 207 U. S. 20, 38, 28 Sup. Ct. 7, 52 L. Ed. 78, 12 Ann. Cas. 757. It has been held that an offer in court to pay is not enough, that payment or actual tender to the tax collector of the just tax is a condition precedent to the right to relief. C., B. & Q. R. R. Co. v. Board, 67 Fed. 413, 14 C. C. A. 458; Whitehead v. Loan & Trust Co., 98 Fed. 10, 39 C. C. A. 34. We, therefore, put these allegations aside now, without further notice.

Another charge is that the State Board of Equalization arbitrarily and systematically increased the assessments on Osage County Indian lands for the year 1911 to an amount approximately nearly double the original amounts of assessment. The raise on valuations in Osage County for the purposes of equalization by the State Board for 1911 was about 50 per cent. over their assessed values. This action was taken by the Board in the exercise of its constitutional and statutory powers to adjust and equalize the valuation of real and personal property of the several counties in the State. It appears in Re Appeal of McNeal, 35 Okl. 17, 128 Pac. 285, that the same rate of increase was applied by the board to all of the counties in the State. The Supreme Court in that case approved the action of the State board. There were also 15 per cent. increases by the State board for 1915 and 1916. The power given to the board is a usual one, it is frequently exercised, sus-

tained and enforced; and there is no evidence here that its action for any of the three years was unfair, unjust and prejudicial as to the lands and personal property subject to taxation in Osage County for those years.

Reverting now to the bill and its amendment,—the answer denied the material allegations, and particularly that the lands of the Indians were systematically, intentionally, arbitrarily or capriciously over-valued for assessment for any of the years, denied that other lands or town lots were undervalued, alleged that the assessments were properly and fairly made, and "that many of the Osages whose names are mentioned as owners of lands in Accountant's Schedule 'A' voluntarily paid their taxes with a full knowledge of the facts, before this suit was instituted, and without protest whatsoever; that the Legislature of Oklahoma enacted, and the Governor of said state approved an act effective on March 23, 1917, authorizing the County Commissioners of Osage County to remit any penalty which had attached to any taxes for the years of 1910 to 1915, inclusive, on any lands owned by the members of Osage Tribe of Indians, if said taxes were paid on or before October 1, 1917; that the Board of Commissioners under the above authority remitted all the penalties which had accrued on unpaid taxes on all lands owned by Osage Indians, if said taxes were paid on or before October 1, 1921; that many of the Osage Indians, in whose behalf this suit was instituted by the plaintiff, voluntarily paid their taxes and saved the penalty, and acted with full knowledge of the facts."

The answer further set up estoppel by judgment in a prior action between the same parties. The case was then referred to a master, who heard the evidence and made report, with recommendations as to the character of decree to be entered. The facts in support of the plea of estoppel, which we now consider, are as follows:

[1] In September, 1911, this plaintiff filed a bill against the Board of County Commissioners, the county clerk and county treasurer of Osage County, in which it challenged the validity of the tax levy on all of the lands of the Osage Indians, including homesteads as well as surplus allotments, for the year 1910. That bill as amended claimed that the homestead allotments were exempt from taxation. The answer admitted that they were exempt under the Allotment Act of June 28, 1906 (34 Stat. 539), for a period of 25 years from the date of the approval of that Act, except that upon the death of any homestead allottee the homestead allotment thereupon became subject to taxation. The bill also claimed that the surplus allotments were exempt, and further that title to the surface only in the surplus allotments was vested in the allottees, the mineral in those allotments having been reserved for a period of 25 years from the date of the Allotment Act to the Osage Tribe in common, and for that reason also there could be no assessment for taxes made against the surplus allotments. It was alleged that the defendants claimed that the lands were subject to taxation and taxable as of March 1, 1910, that valuations had been fixed upon them for that purpose but that those valuations did not represent the true actual value of the surface only of the lands subject to the mineral reservation, but that they had been assessed for taxation for the year 1910 far above the true actual value of said lands, with the limitation on the title and use thereof, that they had been assessed far in excess of their true actual selling value, and that the assessments were illegal. The answer denied that the lands had not been assessed at the true actual value of the surface only, and denied that in fixing valuations on the lands for the purpose of assessment the value of the mineral rights was not deducted. The case went to final hearing in April, 1913. The court heard the evidence adduced by the parties and the arguments of counsel, as shown on the face of the decree. The application for a perpetual injunction against the defendants as prayed for in the bill, enjoining the collection of taxes for 1910 levied on the surplus allotments, was refused and denied. The court held that the surplus allotments were subject to taxation for the year 1910, and that the assessment had been made by properly excluding therefrom the value of the mineral rights reserved in and under the lands. See 193 Fed. 485. This decree was affirmed on appeal to this court in an opinion found in 216 Fed. 883, 133 C. C. A. 87. This is the decree relied on by the defendants in their plea of estoppel. The bill in that case alleged, and the answer denied, that the valuations for 1910 taxes on the surplus allotments were above the true value of those lands, exclusive of the mineral rights, and that the valuations thus made by the tax officials did not represent the true actual value of the surface only, subject to the mineral reservation.

There were two issues of fact thus pre-

sented by the bill and answer, whether the mineral rights reserved for a term of years to the Osage Tribe in common had been excluded in making the valuations for the 1910 tax levy, and whether those valuations were excessive. The first is not pressed in this case, the second is the principal point of contention. But it seems clear issue was joined on both, and that the decree in that case must be held to have adjudicated both, that the parties are bound by that decree and each is thereby estopped from presenting those issues again as judicable controversies. Cromwell v. Sac County, 94 U. S. 351, 24 L. Ed. 195; United Shoe Machinery Co. v. United States, 258 U. S. 451, 458, 42 Sup. Ct. 363, 66 L. Ed. 708. The defendants further contend that the plea of estoppel is good and should be applied as to all taxes assessed and levied since 1910 as well as for 1910, because of these allegations in the bill, found in paragraphs 11, 12, 13 and 14 thereof: The assessments for the year 1910 were arbitrary, grossly excessive, discriminatory and unfair, the assessments for the year 1911 are subject to objection on substantially all grounds hereinbefore recited in connection with the assessments for the year 1910, the assessments for the years 1912, 1913 and 1914 were made in practically the same manner and in the same amounts on the respective tracts as for the year 1910, and are subject substantially to the same objections, both as to the parties, the amounts originally assessed and the penalties claimed for failure to pay the same, and the facts concerning the tax assessment of said lands for the years 1915, 1916 and 1917, the procedure followed in connection therewith and the persons affected are substantially the same as those for the years 1912, 1913 and 1914, the assessments for that year were arbitrarily and unjustly made and are unfair and discriminatory, as in the case of the preceding years. These allegations are not that the assessments made after the year 1910 were on valuations identical in amount with valuations for assessments of prior years. They are that the assessments were substantially the same and practically the same. But exhibits attached to the bill, and to which these allegations referred, show that as to many tracts the variations in value for the different years were in some instances comparatively large amounts. Tax assessments had not been made for several of the years in controversy when validity of tax assessments of 1910 was being litigated. We are cited to Baldwin v. Maryland, 179 U. S. 220, 21 Sup. Ct. 105, 45 L. Ed. 160, but we think the principle there announced is not applicable to the facts here.

[2] We come to the real controversy in this case,—Were the lands over-valued in fact, or in a comparative sense; and if so, was that done in such a way as to give jurisdiction to a court of equity to interfere and stop the collection of taxes based on that valuation? The bill made the necessary allegations as a basis for such a case. It was so held by the Supreme Court. It averred both, an over-valuation in fact and an over-valaution as compared to the valuations on other lands and town lots. To sustain its case as thus pleaded it was incumbent on plaintiff to establish by proof that the valuations were excessive, in fact or comparatively to valuations on other property, and that the tax officials in making them did so intentionally for the purpose of discriminating between taxpayers. The valuation, of course, is an intentional act, whether it be too high or too low; and where it is no more than an honest error of judgment, relief is not to be obtained by action in court, which results in tying up the public revenue for an indefinite time to widespread public detriment, but through local procedure which makes provision for speedy readjustment of valuations in order that the tax burden may be equalized. The statutes of Oklahoma provide a procedure for that purpose. Where the valuations are excessive it is not expected or required that a purpose to discriminate shall be established by direct proof. It may be inferred from facts and circumstances. The principle in mind is tersely stated in Sioux City Bridge Co. v. Dakota County, 260 U. S. 441, 447, 43 Sup. Ct. 190, 192 (67 L. Ed. 340, 28 A. L. R. 979):

"It is therefore just that upon reversal we should remand the case for a further hearing upon the issue of discrimination, inviting attention to the well-established rule in the decisions of this Court, cited above, that mere errors of judgment do not support a claim of discrimination, but that there must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity."

See also Adams Express Co. v. Auditor, 165 U. S. 194, 229, 17 Sup. Ct. 305, 41 L. Ed. 683.

[3] Before considering the proof which appellant claims sustains these requirements, a statement of conditions out of which the controversy arose will be helpful to a cor-

rect estimate of the facts found in the record. Osage County comprises about 1,600,-000 acres. Practically all of it was allotted to members of the Tribe under the Act of June 28, 1906 (34 Stat. 539). Both adults and minors each made a first selection of 160 acres, then a second selection of 160 acres, then a third selection of 160 acres, and the remaining lands were divided equally between them. It was required that one of the selections should be known as a homestead, the allottee being given the privilege to designate which of his three selections should be the homestead, and the certificate of allotment so designated it. The homestead selections remain non-taxable. As a rule they are the most valuable tracts. The surplus lands, other than the homestead, were non-taxable for a period of three years from the date of the approval of the Act, except where certificate of competency is issued to the allottee, or in case of the death of the allottee. Each allottee originally had from 495 to 505 acres in addition to the homestead. These surplus lands then became first taxable in the year 1910. In that year and the following year there was township organization, and township officers during those years made the assessments and tax levies. Then township organization was abolished and county assessors, during the year 1912 and thereafter, made the assessments and levies. The burden of listing and assessing the lands which first became taxable in the year 1910 was a large one, and the record is convincing that it was crudely done by the township officers. Some lands that were taxable were omitted from the assessment rolls, some were erroneously entered as to acreage; but it is shown that the lands involved were appropriately put upon the tax rolls, and more than a third of the acreage in the county first went upon the tax books that year as taxable and levies were made thereon. The penalty for non-payment was 18 per cent. per annum of the amount of the taxes. Most all of the 1551 non-competent Indians owning 697,301 acres of the surplus lands appear to have been indifferent and neglected payments. That situation continued until 1916, the penalties then averaged 63 per cent. of all prior and unpaid taxes, when the Secretary of the Interior sent a representative to Oklahoma to confer with the county and state officials in reference to the whole matter. After these conferences the State Legislature passed an Act March 23, 1917, authorizing the Board of Commissioners of Osage County to remit all penalties for non-payment of taxes for the years 1910, 1911, 1912, 1913, 1914 and 1915, on lands belonging to members of the Osage Tribe, provided the full amount of taxes theretofore levied against the lands, exclusive of penalties, should be tendered to the county treasurer on or before the first day of October, 1917. Remissions were made by the Board and many of the Indians paid their taxes. Prior to legislative action authorizing remission of penalties and on December 14, 1916, the Secretary of the Interior addressed a letter to the Chairman of the Senate Committee on Indian Affairs in relation to the subject, in which among other things he said:

"The government as represented by officers of the Interior Department has resisted from the first the assessment and payment of taxes on Osage lands. * * * It has been deemed necessary by the government to make this fight because there never has been a fair and just appraisement of the Osage lands. Many mistakes have been made, some in mere matters of calculation. The assessments in some cases have been exhorbitant and in other cases inaccurate and wholly inconsistent one with another. Besides these objections, there is also the matter of the delinquent tax penalty, which by this time, if collected, will almost double the assessment."

He referred to the conferences held by his representative with state and county officials. He desired a speedy settlement of the difficulty and recommended that Congress provide for an appraisement to be made on a fair and reasonable basis by disinterested appraisers of all lands in the county owned by Osage Indians as allottees or heirs of tribal members, for use in adjusting and settling the controversy. Congress passed the Act (39 Stat. 983) on March 2, 1917, providing for an appraisement on a fair and reasonable basis by disinterested appraisers. Accumulated penalties was, we think, the immediate and moving cause of the Secretary's intercession. Pursuant to that Act William E. Savage, who had resided at Pawhuska, Osage County, for several years, and who had had extensive experience in appraising lands in court proceedings; Luther Cox who had been in the government service for many years, but was temporarily released for the purpose of acting as appraiser; and a Mr. Graves of Texas, were appointed appraisers. During the months of June, July, August, September and October, 1917, Mr. Savage and Mr. Cox went over the 697,301

acres and made their appraisement. Mr. Graves had little or nothing to do with that. He did the office work. After that appraisement was made it was turned over to special accountants and assistants who made up in detail a great mass of calculations and deductions contained in schedules comprising several large volumes brought into this case as exhibits. The valuations made by the tax officials were entered on these schedules and like calculations and deductions made and entered as to each tract assessed, presenting a ready comparison between the two and showing the difference in amounts of taxes on applying the rates of levy to the two valuations, also amounts of taxes, penalties and costs that had been paid and those that had not been paid. The sum total of these on each valuation (by tax officials and Government appraisers) and the differences between them are set out in the amendment, and have been stated above. Tax valuations and assessments for 1910 were included in these schedules and in the calculations and deductions, likewise the appraisement made by the Government appraisers was extended over that year and included for the same purposes, and so used by the plaintiff's expert accountants in the schedules. These schedules, then, were of a dual character, in one aspect resting on valuations of each tract made by tax officials as basis of assessments, and in the other on valuations of each tract made by Government appraisers.

But the master considered and reported the two valuations, State and Federal, in the aggregate for the eight years, deduced therefrom and stated in his report the average value per acre for each year on each valuation, and therefrom found and reported that value to be $4.88 according to the Federal appraisement and $8.18 according to the tax assessments. That is, he did not consider and report on valuations of separate tracts for the different years and make findings thereon as to the different tracts. No exceptions to his report and the findings he made were taken, on account of the mass method and treatment which he adopted, no error is assigned as to that; and counsel in presenting the case here have followed that method. For that purpose the assessed value on all of the land for each of the eight years, including 1910, was added, that sum divided by eight and the quotient divided by the number of acres. The Federal appraisers fixed an average value per tract for the eight years, which was added and the sum divided by the number of acres. The two results gave the two average values per acre

per year. The master thought the average per acre on the Federal appraisement too low by one-fourth, it should be $6.10 instead of $4.88. He thus raised the total amount of taxes for the eight years, if the Federal appraisement were applied, from $480,013.64 to $600,017.05. The lands are principally suited to and used for pasturage. They are grass lands, and there is an established practice and business of renting them for that purpose. Cattle are brought there from Texas and other States. Rentals for that purpose were about 50¢ per acre for 1910, but they increased more than 100 per cent. during the years in question. Some of the land is agricultural. Wheat, corn and other grains are raised. The lands are not of an even quality, some limestone, some sandstone, some prairie, some rocky and timbered. The county is said to be within the rain belt. As a rule pasture lands were assessed for taxation at $10 per acre, though some were valued much lower, and agricultural lands higher. The government appraisers put much lower values on all classes. Later the Indian agency asked the Board of County Commissioners to adopt for tax assessments the values placed by the Federal appraisers on the different tracts. The board refused to do so, on the claim that those values were too low. One of the members of the board, who was also a member of the Osage Tribe, testified that the board gave as a reason therefor that it was of the opinion that there were no lands in the county that should be taxed on a valuation of less than $5 per acre, to be graded on up to as high as $12 per acre on pasture lands and $15 to $20 per acre on farm lands, that any other basis would be unjust to others who owned lands in the county. Mr. Savage, as heretofore pointed out, had acted as appraiser of Osage lands in many proceedings in probate court and also in partition suits in the district court, and on cross-examination he admitted that, acting with two other appraisers in such proceedings, he had placed values on lands two, three and in some instances four times more than the values placed on the same lands by the Federal Appraisement Board of which he was a member. The record contains 20 pages of such instances, approximating several hundred appraisements, some of which, however, were not on lands involved here but on lands claimed to be of like character. Some of those appraisements, it is conceded, were made after 1917, when land values had increased. But the wide difference between the values fixed by

the Federal appraisers and those fixed in other proceedings in which Mr. Savage participated as an appraiser is in large part unaccounted for. The Act of March 2, 1917, provided for an appraisement on a fair and reasonable basis, whereas, in making assessments for taxation the State constitution fixed the basis of assessment as the fair cash value of the land, "estimated at the price it would bring at a fair voluntary sale". This may account in part for the difference in values fixed by county officers and Federal appraisers. Mr. Savage testified that he never thought about what the laws of Oklahoma required for assessing lands for taxation, but put on a value for what they would be worth from 1910 to 1917. "Just averaged the land clean back to 1910." He was trying to strike the average from 1910 to 1917. He estimated that 20 per cent. of the lands in the county were good for raising crops, the remainder was pasture lands. Appraiser Cox said he based valuations on what the lands would rent for and what they would sell for if put up and sold. Before starting out to make the appraisement he was instructed by the Indian Agency to put a fair value on the lands for taxation for a period commencing in 1910 and ending in 1917. He knew nothing about these lands until 1915, not having been in Osage County prior to that time. He was in the employment of the Indian Agency prior to and immediately after making the appraisement, but his salary as such employé did not go on while he was making the appraisement. He was paid out of the appropriation made by Congress. Savage and Cox were appointed appraisers at the suggestion of the Superintendent of the Osage Indian Agency.

The defendants also offered proof that some of the lands, and others claimed to be of like character, had sold at prices much in excess of the Federal appraisement values. Of these there were 72 allotments involved here, comprising 13,344 acres, which sold for $270,357. These allotments were assessed for taxation at an average value for each of the eight years of $102,529. The Federal appraisers fixed their value at $67,079. It was also shown that a number of other allotments involved here were sold through the Indian Agency in November, 1916. They were scattered well over the county. They sold for $101,678.03, and their average yearly assessed value was $84,629.50. McCuiston testified that he had been county farm agent for Osage County since November 1, 1916, that his

supervisory force is composed of Department of Agriculture representatives and that he is under the Department of Agriculture for the Federal Government, that in pursuance of his duties he had been all over the entire county of Osage several times, and exclusive of Indian homesteads it was his opinion that the minimum value of lands in the county was $10 an acre and the maximum $100, that the county had many advantages for grazing purposes over other parts of the country, it is further east than any other considerable section of what is usually spoken of as range territory and is in the rain belt, that the grass is of superior quality, that about 25 per cent. of the lands in the county is agricultural, that cotton is grown in the southern part of the county, in many places alfalfa is raised, also wheat, corn and oats. The tax rolls for some of the earlier years were testified to. Those data cannot all be given, but it appeared that in Fairfax township the tax assessments in 1912 were at values from $5 to $8 per acre; in Black Dog township much of it was assessed at $5 per acre; in Strikeaxe township for the same year much of it was assessed at $5 per acre; in Bigheart township much of the land in 1913 was assessed at $5, $6 and $7 per acre and some as low as $3, some as high as $15; in Hominy township in 1913 most of it was from $8 to $10 per acre. The county is divided in eight townships or municipal districts.

The foregoing comprises, we think, a fair summary of the evidence on the inquiry whether the surplus lands of the 1551 non-competent Indians was over-valued for taxation on the basis of its fair cash value, "estimated at the price it would bring at a fair voluntary sale".

Exclusive of homesteads there were many thousand acres of taxable land in the county, other than surplus lands belonging to the 1551 non-competent Indians, which belonged to competent Indians and whites; and the plaintiff offered no evidence as to the assessed value that had been made against those lands for taxes for any of the eight years, nor of their value as compared to the value of the lands involved in this suit. Neither did it show or offer to show the assessed taxable value and the fair cash value of personal property in the county for any of those years, nor at what per cent. of its fair cash value it had been assessed for taxation. It is claimed, however, that a purpose on the part of the tax officials to discriminate against non-competent Indians and actual discrimination against them and

their lands in fixing the tax burden is established by evidence (1) that town lots and buildings in the five townsites in the county (Pawhuska, Hominy, Fairfax, Foraker and Bigheart) were assessed for taxation far below their fair cash value, and that that class of property is principally, though not entirely, owned by whites; and (2) the lands of non-competent Indians sold to whites during the eight years were for years following sales greatly reduced in value for taxation. To establish the first proposition plaintiff proceeded in three ways. It selected a number of lots in each town, took the assessed value of the lots for taxation, and then offered testimony showing that the fair cash value was much in excess of the assessed value; it also took from the records considerations named in deeds on the sale of lots in each town, and comparing the consideration named in the deeds with the assessed value, the latter was much lower than the former. These sales represented 53 transactions in Pawhuska, 20 in Bigheart, 7 in Fairfax, 3 in Foraker and 28 in Hominy. It also took from the records the amount of mortgage loans on lots in the towns, and then, estimating that the mortgage debt was about half of the value of the property, it appeared again on that basis that the assessed valuations were far below the real value of the lots. These were averaged and the results reached set out in exhibits, showing that lots in the instances covered were assessed for taxes at about 50 per cent. of their value. An exhibit was also made up and put in the record showing that the total assessments of the five townsites for the eight years for the purpose of taxation was $20,705,486, or an average for each of the eight years of $2,588,186. Thereupon it is argued that the townsites, for each of the eight years, were assessed at approximately 50 per cent. of their true value. We doubt the soundness of the claimed deduction, from the proof adduced. Experience teaches that the assumption that property mortgaged is worth twice the debt is not a reliable guide. Taking the tax assessment for 1912, exhibits show that assessed values relied on in this proof were as follows: In Fairfax, 20 lots, assessed value $40,472; Hominy, 19 lots, assessed value $82,255; Foraker, 12 lots, assessed value $23,500; Bigheart, 30 lots, assessed value $20,575; Pawhuska, 66 lots, assessed value $181,044; these 147 lots in the five towns having a total assessed taxable value for that year of $347,846, which is less than 14 per cent. of the annual average assessed value of the five townsites. The basis for the conclusion sought is too narrow.

To sustain the second proposition relied on, it was shown that in a good many instances the assessed taxable value of lands of non-competent Indians was reduced after they were purchased by white men. But it was also shown that in almost every instance where that was done, adjoining lands, or lands nearby still owned by Indians were also reduced in taxable value in the same proportion, and apparently that was done without request on the part of the Indians. Throughout the eight years in question there was at almost all times a member of the Osage Tribe, or an intermarried citizen of the Tribe, on the Board of Commissioners, and we think the evidence fails to sustain the contention that there was a disposition on the part of the Board, or of any of the county officials, to deal unfairly with the Indians as against the whites in the matter of taxation.

The Master appears to have been guided on the question of values by the Federal appraisement after he had increased it 25 per cent. He also thought there had been discrimination between the tax levies on lands and townsites, basing that conclusion on the facts that have been recited. The Master eliminated taxes for 1910 on the ground of res adjudicata in the prior suit, and recommended that the defendants be enjoined from collecting unpaid taxes and penalties for the years 1911 to 1917, inclusive, on any valuations in excess of those fixed by the Federal appraisers, from executing tax deeds to any of the lands belonging to the 1551 non-competent Indians under tax sales for any of those years, and that all sales that had been made be declared null and void and that all other relief prayed for be denied. On arguments of exceptions to the Master's report the court concluded that the plaintiff had not made its case and dismissed the bill. A careful reading and study of the record as it is presented to us fails to convince our minds that the court erred. Errors in valuation were likely made, both as to lands and town lots, and there may have been many of them, but those with authority appear to have been ready and willing at all times to speedily correct them whenever called to their attention. Taking the lands as a whole, we think it cannot be said that the record shows that they were over-valued, nor do we believe that there was intention or purpose on the part of the local tax officials to discriminate against the Indians in any of the tax

levies. In the first suit, brought to test the validity of the tax levy for 1910, the plaintiff contended that the surplus lands were not taxable. The trial court, in an opinion rendered December 26, 1911, 193 Fed. 485, held they were subject to taxation under the Act of June 28, 1906. Not satisfied with that ruling the plaintiff appealed to this court and the judgment was affirmed on August 20, 1914. 216 Fed. 883, 133 C. C. A. 87. Then the plaintiff appealed to the Supreme Court, and that court dismissed the appeal on May 3, 1917. 244 U. S. 663, 37 Sup. Ct. 649, 61 L. Ed. 1377. In September following this suit was brought. Some of the Indians had paid their taxes but most of them, doubtless encouraged to do so by the appeals in the first case, neglected to pay and heavy penalties accrued. Then from time to time others paid and the penalties were added. Finally, through legislative action those who had not paid were relieved from the penalties and more of them paid. At all times state and county officials seem to have dealt with the subject in a spirit of fairness, but at all times insisted that there had been neither over-valuation nor discrimination. We do not think that they can be justly convicted of a neglect of duty in either respect on this record.

The judgment is affirmed.