Ex parte DAVID NOWABBI.

No. A-9055.   Oct. 26, 1936.
(61 Pac. [2d] 1139.)

112

116

118

Hamilton & Howard, for petitioner.

Mac Q. Williamson, Atty. Gen., and F. M. Dudley, Asst. Atty. Gen., for respondent.

DOYLE, J. (after stating the facts as above). This is an application for discharge from imprisonment in the state penitentiary by writ of habeas corpus on the part of David Nowabbi. The petitioner is in the custody of the warden of the state penitentiary, under sentence of imprisonment at hard labor for life, pronounced and entered November 15, 1923, by the district court of Pushmataha county, in pursuance of the verdict of a jury finding him guilty of murder and assessing his punishment at imprisonment in the state penitentiary for life. The information filed in said district court September 19, 1923, omitting merely formal parts, charges: "That Nelson Cooper and David Nowabbi did, in Pushmataha county in the state of Oklahoma on or about the 23 day of April, 1923, commit the crime of murder in manner and form as follows, to wit: Did then and there willfully, wrongfully, and unlawfully, and feloniously, with premeditated design to effect the death of a human being, shoot and kill Davidson Houston with a certain rifle, with a pre-

meditated design and intent to kill and murder him the said Davidson Houston, contrary to," etc.

The judgment and sentence against petitioner upon his separate trial was on appeal to this court affirmed. See Nowabbi v. State, 31 Okla. Cr. 158, 237 Pac. 868.

It is claimed on behalf of the petitioner that the crime of murder of which he stands convicted having been committed on the Restricted Indian Allotment of the said Davidson Houston, deceased, a full-blood Choctaw Indian, the petitioner also being a full-blood Choctaw Indian, it was committed on land in the Indian country under the exclusive jurisdiction of the United States, and being a crime committed then and there in violation of the laws of the United States, the sole and exclusive jurisdiction thereof was in the United States District Court for the Eastern District of Oklahoma. "Therefore: The trial, conviction and sentence in the district court of Pushmataha county, Oklahoma, were illegal, null and void."

Wherefore petitioner was deprived of his liberty without due process of law, and his confinement is in contravention to the Constitution and laws of the United States.

The sixth article of the Constitution of the United States declares:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Tenth Amendment, thereto declares:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

And section 1 of article 1 of the Oklahoma Constitution declares that:

"The Constitution of the United States is the supreme law of the land."

The language of article 6 and the aforesaid section is direct and certain, and the adjudications of the United States Supreme Court on this question are conclusive on the state courts.

By the Enabling Act of June 16, 1906, 34 Stat. 267, Congress provided for the admission of Oklahoma into the Union as a state on an equal footing with the original states. Compliance with stated conditions were made a prerequisite to the admission and these conditions were complied with. On November 13, 1907, by proclamation of the President, Oklahoma was admitted into the Union as a state with all of the powers of sovereignty, dominion, and jurisdiction which pertain to the original states, subject like them only to the Constitution of the United States.

Several of the conditions of the Enabling Act relate to Indians and Indian lands and to the respective relations thereto of the United States and the state are as follows:

Section 1 of the Enabling Act provides:

"That nothing contained in the said Constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said Territories (so long as such rights shall remain unextinguished) or to limit or affect the authority of the Government of the United States to make any law or regulation respecting

such Indians, their lands, property, or other rights by treaties, agreement, law, or otherwise, which it would have been competent to make if this Act had never been passed."

Section 2 provides: ·

"That all male persons over the age of twenty-one years, who are members of any Indian nation or tribe in said Indian Territory and Oklahoma, and who have resided within the limits of said proposed state for at least six months next preceding the election, are hereby authorized to vote for and choose delegates to form a constitutional convention for said proposed state; and all persons qualified to vote for said delegates shall be eligible to serve as delegates."

Section 3 provides:

"The Constitution shall be republican in form, and make no distinction in civil or political rights on account of race or color."

Subdivision 2, § 3, requires that the Constitution shall prohibit the manufacture and sale of intoxicating liquors within those parts of the proposed state known as the Indian Territory and the Osage Indian Reservation, and within any other parts of said state which existed as Indian reservations on January 1, 1906, and shall prohibit the shipment or conveyance of such liquors from other parts of the state into the portions just described; the prohibition to continue for a period of 21 years, and thereafter until the people shall otherwise provide by constitutional amendment and proper state legislation; with a proviso for the establishment of state agencies for the sale of liquors for medicinal purposes and to bonded apothecaries, or denaturized alcohol for industrial purposes and of alcohol for scientific purposes; and with elaborate provisions for carrying the prohibition into effect and preventing any abuse of the limited privileges con-

ferred; it being declared, at the same time, that "upon the admission of said state into the Union these provisions shall be immediately enforceable in the courts of said state."

Subdivision 3 provides:

"That the people inhabiting said proposed state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and ·to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. That land belonging to citizens of the United States residing without the limits of said state shall never be taxed at a higher rate than the land belonging to residents thereof; that no taxes shall be imposed by the state on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use."

Under the provisions of Act of July 1, 1902, 32 Stat. 641, entitled:

"An act to ratify and confirm an agreement with the Choctaw and Chickasaw tribes of Indians, and for other purposes," the two tribes ceded and conveyed to the United States certain lands in the Chickasaw Nation, to be known as the Sulphur Springs Reservation.

Section 7 Enabling Act (see 16 U.S.C.A. § 153) in part provides:

"That nothing in this act contained shall repeal or affect any act of Congress relating to the Sulphur Springs Reservation as now defined or as may be hereafter defined or extended, or the power of the United States over it or any other lands embraced in the State hereafter set aside by Congress as a national park, game preserve, or for the preservation of objects of archaeological or ethno-

logical interest; and nothing contained in this act shall interfere with the rights and ownership of the United States in any land hereafter set aside by Congress as national park, game preserve, or other reservation, or in the said Sulphur Springs Reservation, as it now is or may be hereafter defined or extended by law; but exclusive legislation, in all cases whatsoever, shall be exercised by the United States, which shall have exclusive control and jurisdiction over the same."

The Sulphur Springs Reservation was designated the "Platt National Park" by resolution of June 29, 1906, 34 Stat. 837.

Section 21 in part provides: That the Constitutional Convention "shall constitute the Osage Indian Reservation a separate county, and provide that it shall remain a separate county until the lands in the Osage Indian Reservation are allotted in severalty and until changed by the Legislature of Oklahoma."

The Constitution of Oklahoma (article 1, § 3) declares:

"The people inhabiting the state do agree and declare that they forever disclaim all right and title in or to any unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States, the same shall be and remain subject to the jurisdiction, disposal, and control of the United States. Land belonging to citizens of the United States residing without the limits of the State shall never be taxed at a higher rate than the land belonging to residents thereof. No taxes shall be imposed by the state on lands or property belonging to or which may hereafter be purchased by the United States or reserved for its use."

For present purposes it is admitted, but not conceded, that the homicide charged in the information was committed on a restricted Indian allotment in what was formerly the Choctaw Nation.

The question thus presented is whether the courts of the United States or the state courts have jurisdiction to try, convict, and punish an Indian for committing the crime of murder upon the person of another Indian, upon a restricted Indian allotment, within the boundaries of the former Choctaw Nation of the Indian Territory.

The petitioner in support of his contention that the state courts were without jurisdiction and that the offense alleged was one in violation of the laws of the United States and within the exclusive jurisdiction of the federal courts relies upon the following provisions of law:

Section 2145, Rev. Stats. (section 217, title 25, U. S. C.A.):

"Except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

And Act of March 3, 1885, 23 St. 385, c. 341, § 9, as amended Criminal Code, § 328 (section 548, title 18, U. S. C.A.):

"All Indians committing against the person or property of another Indian or other person any of the following crimes, namely—murder, manslaughter, rape, assault with intent to kill, assault with a dangerous weapon, arson, burglary, and larceny, within any territory of the United States, and either within or without an Indian reservation, shall be subject therefor to the laws of such territory relating to said crimes, and shall be tried there-

for in the same courts and in the same manner and shall be subject to the same penalties as are all other persons charged with the commission of said crimes, respectively; and the said courts are hereby given jurisdiction in all such cases. And all such Indians committing any of the above-named crimes against the person or property of another Indian or other person within the boundaries of any state of the United States, and within the limits of any Indian reservation, shall be subject to the same laws, tried in the same courts and in the same manner, and be subject to the same penalties as are all other persons committing any of the above crimes within the exclusive jurisdiction of the United States. Any Indian who shall commit the offense of rape upon any female Indian within the limits of any Indian reservation shall be imprisoned at the discretion of the court. (Mar. 3, 1885, c. 341, § 9, 23 Stat. 385; Jan. 15, 1897, c. 29, § 5, 29 Stat. 487; Mar. 4, 1909, c. 321, § 328, 35 Stat. 1151.)"

The constitutionality of this act was challenged in the case of United States v. Kagama, 118 U.S. 375, 6 S. Ct. 1109, 1110, 30 L. Ed. 228. In that case the defendant was indicted for the murder of another Indian in Humboldt county, in the state of California, within the limits of the Hoopa Valley Reservation. The Supreme Court held said act to be valid and constitutional in both of its branches.

Mr. Justice Miller, speaking for the court, said:

"The above enactment is clearly separable into two distinct definitions of the conditions under which Indians may be punished for the same crimes as defined by the common law. The first of these is where the offense is committed within the limits of a territorial government, whether on or off an Indian reservation. In this class of cases the Indian charged with the crime shall be judged by the laws of the territory on that subject, and tried by its courts. This proposition itself is new in legislation of Congress, which has heretofore only undertaken to punish

an Indian who sustains the usual relation to his tribe, and the offense is committed in the Indian country, or on an Indian reservation, in exceptional cases; as where the offense was against the person or property of a white man, or is some violation of the trade and intercourse regulations imposed by Congress on the Indian tribes. It is new, because it now proposes to punish these offenses when they are committed by one Indian on the person or property of another.

"The second is where the offense is committed by one Indian against the person or property of another, within the limits of a state of the Union, but on an Indian reservation. In this case, of which the state and its tribunals would have jurisdiction if the offense was committed by a white man outside an Indian reservation, the courts of the United States are to exercise jurisdiction as if the offense had been committed at some place within the exclusive jurisdiction of the United States. The first clause subjects all Indians, guilty of these crimes committed within the limits of a territory, to the laws of that territory, and to its courts for trial. The second, which applies solely to offenses by Indians which are committed within the limits of a state and the limits of a reservation, subjects the offenders to the laws of the United States passed for the government of places under the exclusive jurisdiction of those laws, and to trial by the courts of the United States."

In the case of Ex parte Wilson, 140 U.S. 575, 11 S. Ct. 870, 871, 35 L. Ed. 513, the court said:

"The words 'sole and exclusive,' in section 2145 do not apply to the jurisdiction extended over the Indian country, but are only used in the description of the laws which are extended to it."

Reference is made to the case of Donnelly v. U. S. (Cal.) 228 U.S. 243, 33 S. Ct. 449, 57 L. Ed. 820, Ann. Cas. 1913E, 710, holding:

"The term 'Indian country,' as used in U.S.Rev.Stat. § 2545 [title 25 U.S.C.A. § 215], which extended to that country certain general laws of the United States as to the punishment of crime, is not confined to lands to which the Indians retained their original right of possession, but includes a tract of land lawfully set apart for an Indian reservation out of the public domain, and not previously occupied by the Indians."

And to the case of U. S. v. Ramsey, 271 U. S. 467, 46 S. Ct. 559, 70 L. Ed. 1039, holding:

"Land formerly a part of the Osage Indian Reservation, which is in possession under a restricted allotment of an Indian who is not authorized to alienate it, is Indian country within the meaning of U. S. Rev. Stat., § 2145, extending the general laws of the United States to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, to the Indian country."

Mr. Justice Sutherland delivered the opinion as follows:

"The defendants in error, two white men, were charged by an indictment returned in court below, with the murder of one Henry Roan, a full-blood Osage Indian and a legal member of the Osage Tribe, committed 'in Osage county, in said district, in the Indian country, and in and upon the reservation theretofore and then established by law of the United States for the Osage Tribe of Indians, on and in a certain tract of land therein which was then and there under the exclusive jurisdiction of the United States and comprised a restricted surplus allotment, theretofore made under and according to the Act of Congress approved June 28, 1906, * * * the title to which said allotment * * * was held in trust by the United States and was inalienable' by the allottee, who had never had issued to her a certificate of competency authorizing her to sell the allotment. The indictment is drawn under section 2145, Rev. St. (Comp. St. § 4148 [25 U.S.C.A. §

217]), which extends the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, to the Indian country, with certain exceptions not material here.

"The court below sustained a demurrer to this indictment upon the ground that the allotment described in the indictment as the locus of the crime was not Indian country within the meaning of the section 2145. Thereupon, the construction of the statute upon which the indictment is drawn being involved, the case was brought here on writ of error under the Criminal Appeals Act of March 2, 1907, c. 2564, 34 Stat. 1246 (Comp. St. § 1704 [18 U.S.C.A. § 682]).

"The authority of the United States under section 2145 to punish crimes occurring within the state of Oklahoma, not committed by or against Indians, was ended by the grant of statehood. United States v. McBratney, 104 U.S. 621, 624, 26 L. Ed. 869 [870]; Draper v. United States, 164 U.S. 240, 17 S. Ct. 107, 41 L. Ed. 419. But authority in respect of crimes committed by or against Indians continued after the admission of the state as it was before (Donnelly v. United States, 228 U.S. 243, 271, 33 S. Ct. 449, 57 L. Ed. 820 [832], Ann. Cas. 1913E, 710), in virtue of the long-settled rule that such Indians are wards of the nation, in respect of whom there is devolved upon the federal government 'the duty of protection and with the power' (United States v. Kagama, 118 U.S. 375, 384, 6 S. Ct. 1109, 30 L. Ed. 228 [231]). The guardianship of the United States over the Osage Indians has not been abandoned; they are still the wards of the nation (United States v. Board of Com'rs of Osage County, 251 U. S. 128, 133, 40 S. Ct. 100, 64 L.Ed. 184 [187]; United States v. Nice, 241 U. S. 591, 598, 36 S. Ct. 696, 60 L. Ed. 1192 [1195]; and it rests with Congress alone to determine when that relationship shall cease (Re Heff, 197 U. S. 488, 499, 25 S. Ct. 506, 49 L. Ed. 848 [853]; United States v. Celestine, 215 U. S. 278, 290, 30 S. Ct. 93, 54 L. Ed. 195 [199]).

"The sole question for our determination, therefore, is whether the place of the crime is Indian country within the meaning of section 2145. The place is a tract of land constituting an Indian allotment, carved out of the Osage Indian reservation and conveyed in fee to the allottee named in the indictment, subject to a restriction against alienation for a period of 25 years. That period has not elapsed, nor has the allottee ever received a certificate of competency authorizing her to sell. As pointed out in United States v. Bowling, 256 U.S. 484, 486, 41 S. Ct. 561, 65 L. Ed. 1054 [1055], there are two modes by which Indians are prevented from improvidently disposing of their allotments. One is by means of a certificate, called a trust patent, by the terms of which the government holds the land for a period of years in trust for the allottee with an agreement to convey at the end of the trust period. The other mode is to issue a patent conveying to the allottee the land in fee, but prohibiting its alienation for a stated period. Both have the same effect, so far as the power of alienation is concerned, but one is commonly called a trust allotment, and the other a restricted allotment. The judgment of the court below turns upon this narrow difference.

"In United States v. Pelican, 232 U. S. 442, at page 449, 34 S. Ct. 396, 58 L. Ed. 676, a case involving the murder of an Indian upon a trust allotment, this court held that trust allotments retain 'during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by federal legislation,' and that they are embraced within the term 'Indian country' as used in section 2145. But the opinion makes it clear that the difference between a trust allotment and a restricted allotment, so far as that difference may affect the status of the allotment as Indian country, was not regarded as important. The court said:

" 'The explicit provision in the act of [January 30] 1897, as to allotments, we do not regard as pointing a distinction, but rather as emphasizing the intent of Congress in carrying out its policy with respect to allotments

in severalty, where these have been accompanied with restrictions upon alienation or provision for trusteeship on the part of the government. * * * The allottees were permitted to enjoy a more secure tenure, and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands, set apart for Indians under government care, and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the government retaining control.'

"The essential identity of the two kinds of allotments —so far as the question here under consideration may be affected—was recognized in the Bowling Case, where it was said [256 U. S. 484, at page 487, 41 S. Ct. 561, 65 L. Ed. 1054] that in one class as much as the other 'the United States possesses a supervisory control over the land and may take appropriate measures to make sure that it inures to the sole use and benefit of the allottee and his heirs throughout the original or any extended period of restriction.' In practical effect, the control of Congress, until the expiration of the trust or the restricted period, is the same.

"Since Congress possesses the broad power of legislating for the protection of the Indians wherever they may be within the territory of the United States, the question presented is not one of power but wholly one of statutory construction. Viewed from that premise, it would be quite unreasonable to attribute to Congress an intention to extend the protection of the criminal law to an Indian upon a trust allotment and withhold it from one upon a restricted allotment, and we find nothing in the nature of the subject-matter or in the words of the statute which would justify us in applying the term 'Indian country' to one and not to the other.

"It follows that the judgment sustaining the demurrer to the indictment is erroneous, and must be reversed."

Counsel for the petitioner cite United States v. Celestine, 215 U. S. 278, 30 S. Ct. 93, 97, 54 L. Ed. 195.

There the Indian committed murder within the limits of the Tulalip Indian Reservation, and the patent the Indian had received for land was within that reservation. Jursdiction was challenged upon the ground that when the offense was committed there had been allotted to Celestine certain lands on the Tulalip Indian Reservation within the Territory of Washington under the provisions of the Treaty of January 22, 1885, 12 Stat. 927, and that in accordance with executive order patent had been issued in May, 1885; that the Indian was then a member of the Tulalip Tribe and was a citizen of the United States, and therefore subject to the laws of the state of Washington. The court held that, although Celestine had received a patent for the land within the Tulalip Indian Reservation, and although the woman he murdered was the owner of another tract within such limits, also patented, both tracts remained within the reservation until Congress excluded them therefrom. The court also held that, although Celestine was made a citizen of the United States and of the state of Washington, it did not follow that the United States lost jurisdiction over him for offenses committed within the limits of the reservation.

Mr. Justice Brewer, delivering the opinion of the court, in conclusion said:

"Notwithstanding the gift of citizenship, both the defendant and the murdered woman remained Indians by race, and the crime was committed by one Indian upon the person of another, and within the limits of a reservation. Bearing in mind the rule that the legislation of Congress is to be construed in the interest of the Indian, it may fairly be held that the statute does not contemplate a surrender of jurisdiction over an offense committed by one Indian upon the person of another Indian within the limits of a reservation; at any rate, it cannot be said to be clear that Congress intended, by the mere

grant of citizenship, to renounce entirely its jurisdiction over the individual members of this dependent race. There is not in this case in terms a subjection of the individual Indian to the laws, both civil and criminal, of the state; no grant to him of the benefit of those laws; no denial of the personal jurisdiction of the United States.

"The act of May 8, 1906 (34 Stat. at L. 182, chap. 2348 [25 U.S.C.A. § 349]), extending to the expiration of the trust period the time when the allottees of the act of 1887 shall be subject to state laws, is worthy of note as suggesting that Congress, in granting full rights of citizenship to Indians, believed that it had been hasty."

In their brief in support of the petition, counsel say:

"In the case of Ex parte Van Moore (D.C.) 221 F. 954, 970, the court considered an almost identical set of facts as is disclosed by the case at bar. Moore had been convicted in the state court of South Dakota for the crime of murder; sentenced to life imprisonment. The murder was committed on the allotment of an Indian, Walking Eagle, and within the boundaries of the Great reservation of the Sioux Nation; and had been confined in the state penitentiary of South Dakota for apparently about as long as Nowabbi had been confined in the state penitentiary at McAlester. A petition for writ of habeas corpus was filed on September 24, 1914, and alleged that he had been confined in the penitentiary on a life sentence from the state court, from the 12th of July, 1900. The federal court granted the writ and ordered the defendant released, over the contention of the Attorney General that the state court had jurisdiction and the federal court did not. The allotment on which this crime was committed was a trust patent, as distinguished from a restricted allotment. The court reviews most of the cases that we have quoted from above, and the court said:

" 'The word "reservation" is not used. The provision is not made that the Indian "reservation," but the Indian "lands," shall remain, etc., and the lands are not limited

to those of an Indian tribe, but include also those that are held or owned by any Indian.

" 'It is manifest that Indian lands, or the lands of an Indian within a reservation or on the public domain, all come in the same category, all such lands are equally Indian country, and, if so, no state court had jurisdiction to try or sentence the petitioner upon the charge of committing the crime of murder of one Indian by another on this tract of land. U. S. v. Pelican, 232 U. S. 442, 34 S. Ct. 396, 58 L. Ed. 676.' "

It will be observed that the decisions in the cases of U. S. v. Ramsey and Ex parte Van Moore, supra, follow the holding of the court in the Pelican Case.

In U. S. v. Pelican, 232 U. S. 442, 34 S. Ct. 396, 399, 58 L. Ed. 676, the indictment was for the murder, on August 30, 1913, of Ed Louie, a full-blood Indian and a member of the Colville tribe, committed upon the allotment of one Agnes, an Indian, said land being then and there held in trust by the United States for the said Agnes.

The indictment was based upon section 2145, Rev. Stats. (25 U.S.C.A. § 217).

A demurrer was filed upon the ground that it did not appear that the crime had been committed within the "Indian country," and hence that the court was without jurisdiction.

The district court, holding that the Agnes allotment was not a part of "the Indian country" within the meaning of the statute, sustained the demurrer. On writ of error, the order sustaining the demurrer was reversed.

Mr. Justice Hughes, now Chief Justice, delivered the opinion of the court. That portion of the opinion pertinent to the question under consideration in this case is as follows:

"It must be remembered that the fundamental consideration is the protection of a dependent people. As the court said in United States v. Rickert, 188 U. S. 432, 437, 23 S. Ct. 478, 47 L. Ed. 532, 536, where allotments had been made under the conditions provided by the act of February 8, 1887 (and it was found that the agreement with the Indians, 26 Stat. at L. 1035-1038, chap. 543, did not indicate any different relation of the United States to the allotted lands from that created or recognized by that act) : 'These Indians are yet wards of the nation, and a condition of pupilage or dependency, and have not been discharged for that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the act of 1887, and the agreement of 1889, ratified by the act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship.'

"It is true that by § 6 of the act of 1887 [25 U.S.C.A. § 349 note] it was provided that upon the completion of the allotments and the patenting of the lands to the allottees under that act, every allottee should 'have the benefit of and be subject to the laws, both civil and criminal, of the state or territory' in which he resided. See Re Heff, 197 U. S. 488, 25 S. Ct. 506, 49 L. Ed. 848. But, by the act of May 8, 1906, chap. 2348 (34 Stat. at L. 182 [25 U.S.C.A. § 349]), Congress amended this section so as distinctly to postpone to the expiration of the trust period the subjection of allottees under that act to state laws. The first part of the section, as amended, is: 'That at the expiration of the trust period, and when the lands have been conveyed to the Indians by patent in fee, as provided in § 5 of this act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside.' And, at the same time, there was added to the section the explicit proviso: 'That until the issuance of fee-simple patents all allottees to whom trust patents

shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States. We deem it to be clear that Congress had the power thus to continue that guardianship of the government (United States v. Kagama, 118 U. S. 375, 383, 384, 6 S. Ct. 1109, 30 L. Ed. 228, 231; United States v. Celestine, 215 U.S. 278, 290, 291, 30 S.Ct. 93, 54 L. Ed. 195, 199, 200; Marchie Tiger v. Western Invest. Co., 221 U. S. 286, 315, 316, 31 S. Ct. 578, 55 L. Ed. 738, 749, 750; Hallowell v. United States [221 U. S. 317, 31 S. Ct. 587, 55 L. Ed. 750], supra; Heckman v. United States, 224 U. S. 413, 437, 32 S. Ct. 424, 56 L. Ed. 820, 829; Ex parte Webb, 225 U. S. 663, 32 S. Ct. 769, 56 L. Ed. 1248, 1256; United States v. Wright, 229 U. S. 226, 237, 33 S. Ct. 630, 57 L. Ed. 1160, 1166; United States v. Sandoval, 231 U. S. 28, 46, 34 S. Ct. 1, 58 L. Ed. 107, 114; Perrin v. United States, decided this day (232 U. S. 478, 34 S. Ct. 387, 58 L. Ed. 691) ; and these provisions leave no room for doubt as to the intent of Congress with respect to the maintenance of the federal jurisdiction over the allotted lands described in the indictment."

The holding of the court in the Pelican Case and cases therein cited is based upon the second proviso of the Act of May 8, 1906 (25 U.S.C.A. § 349) that:

"Until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States."

At the same time, there was added another and final proviso to the section as follows (25 U.S.C.A. § 349) :

"And provided further, That the provisions of this act shall not extend to any Indians in the former Indian Territory."

In this case we are concerned with the construction of this final provision of said act in so far as it involves the jurisdictional question. And the question for our determination is whether the place of the crime, a restricted allotment in what was formerly the Choctaw Na-

tion, is Indian country within the meaning of section 2145, Rev. Stats. (25 U.S.C.A. § 217). In all of the cases cited by counsel in support of their contention that the allotment of the deceased was Indian country, there is no reference made to this additional and final proviso of the Act of May 8, 1906. Under this provision the case is wholly different as regards Indians in what was formerly the Indian Territory, and Indian allotments within the lands of the Five Civilized Nations or Tribes. The scope and effect of this provision have not been settled by any of the decisions in the cases cited.

A proviso in a statute often has an effect which restricts or enlarges the scope of the entire act. The application of such provisions is not always limited to the matters only in the section in which they appear. They some time have as much force even when attached or subjoined to a paragraph of a statute as they would if standing alone in an independent paragraph. Black Constr. and Interpretation of Laws, par. 110.

Upon consideration of the various acts of Congress, relating to the government of the Indian country, and of the decisions of the Supreme Court of the United States construing the same in connection with U. S. Rev. Stat. § 2145, and Act of March 3, 1885, reserving to the federal courts jurisdiction over certain crimes enumerated in section 9 of said act, as amended (Cr. Code, § 328 [18 U.S.C.A. § 548)] committed against the person or property of another Indian or other person, within the boundaries of any state and within the limits of any Indian Reservation, and Act of May 8, 1906, c. 2348, second proviso (25 U.S.C.A. § 349):

"That until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States."

It may be said that under this provision of said act all Indian allottees and their allotments in that part of the state of Oklahoma that was formerly Oklahoma Territory, are lands in the Indian country within the meaning of section 2145, Rev. Stat., and subject to the exclusive jurisdiction of the United States, until the issuance of fee-simple patents. And the jurisdiction of the courts of the United States over the crimes named in Act of March 3, 1885, to wit, murder, manslaughter, rape, assault with intent to kill, arson, burglary, and larceny when committed on Indian reservations within the boundaries of a state on trust or restricted allotments therein, by whomsoever committed, without distinction as to race or color, is we think no longer open to discussion. It has passed beyond the stage of controversy.

The question here is not what Congress can do, but what has it done. And this extension of the exclusive jurisdiction of the United States over all allottees until the issuance of fee-simple patents, is limited by the final proviso above quoted.

It follows that the question in this case turns on the construction of this final proviso of said act, as limiting and qualifying that which has gone before in the same section.

We think the obvious purpose of the final and explicit proviso of said act was to take the Indians in the Indian Territory out of the category of Reservation Indians. And it shows a clear and unmistakable intention on the part of Congress to limit the jurisdiction of the United States over allotments in the Indian Territory.

Our attention has not been called to any act of Congress which reserved to the federal courts the jurisdiction to punish for the crimes enumerated in the Act of March

3, 1885, when committed within the limits of the former Indian Territory part of the state. We look in vain for authority upon the precise question here involved.

In the case of Higgins v. Brown, Judge, 20 Okla. 355, 94 Pac. 703; Id., 1 Okla. Cr. 33, 94 Pac. 703, the Supreme Court of Oklahoma construing sections 16 and 20 inclusive of the Enabling Act of Oklahoma, concurred in by the adoption of sections 27 and 28 of the Schedule to the Constitution, held:

"An indictment for the crime of murder, alleged to have been committed within the jurisdiction of the United States court for the Northern District of the Indian Territory, and pending in said court on the admission of the state into the Union, is cognizable in the district court of the state, as its successor, in the county in which the offense was committed."

It appears that relator, Elmer Higgins, was on the 9th day of May, 1906, indicted in the United States court for the Northern District of the Indian Territory, at Claremore, charged with the crime of murder in having killed and murdered in said district on the 10th day of April, 1906, one John Hancock, and at the time of the admission of Oklahoma into the Union he was in the custody of the United States Marshal of said court, awaiting trial; that on December 3, 1907, he filed a petition in the United States Court for the Eastern District of Oklahoma, praying for his release and discharge, and the judge of said court upon said petition issued an order directing the marshal to deliver the relator over to the proper officers of the district court of Rogers county. The respondents, T. L. Brown, as judge of said court refused to receive and entertain jurisdiction in said cause against the relator, and refused to permit the same to be filed and docketed and become a part of the records of said court.

His petition for writ of mandamus to issue from the Supreme Court of Oklahoma directed to the respondents requiring them to take jurisdiction was granted.

A reading of the opinion by Williams, Chief Justice, reveals that the conclusions arrived at were the result of an extended study of the various enabling acts and acts of admission of states into the Union, and the decisions of both the federal and state courts construing provisions of the same on questions of jurisdiction.

The opinion concludes as follows:

"The only other reservation as to jurisdiction in the Oklahoma enabling act is contained in the proviso of section 7, to wit: [Quoting the same as hereinbefore set out.]

"By the same process of reasoning followed by the Supreme Court of the United States in cases of United States v. McBratney, supra, and Draper v. United States, supra, we conclude that the Congress, upon the admission of Oklahoma as a state, where it has intended to except out of such state an Indian reservation, or the sole and exclusive jurisdiction over that reservation, it has done so by express words. It is not contended that the alleged crime was committed on any such excepted reservation, or in any place where the United States has the sole and exclusive jurisdiction since the admission of the state. Now, mark you the language, 'had they been committed within a state would have been cognizable in the federal courts,' contained in section 16, as amended March 4, 1907, of the Oklahoma enabling act. Does not that mean in a state similarly circumstanced as one with an enabling act like ours? When you consider this language in connection with section 39 of the same enabling act pertaining to Arizona and New Mexico, supra, it seems that Congress was recognizing the existing conditions and the bringing in of an organized and unorganized territory as one state, and that it was laying down the rule that if such offense had been committed after the admission of the state it would have been cognizable in the federal

court, that then such federal court would have jurisdiction; otherwise not. Any other conclusion can be reached only by reasoning against the apparent and reasonable literal meaning. * * * United States v. Kagama, 118 U. S. 375, 6 S. Ct. 1109, 30 L. Ed. 230; * * * Ward v. Race Horse, 163 U. S. 505, 16 S. Ct. 1076, 41 L. Ed. 244. * * *

"We necessarily conclude that the district court of the county of the state in which the offense was committed has jurisdiction of this offense."

And see Vickers v. United States, 1 Okla. Cr. 452, 98 Pac. 467.

In the case of Underhill v. State, 31 Okla. Cr. 149, 237 Pac. 628, this court held:

"The courts of Oklahoma will take judicial notice of the fact that the Platt National Park was under the exclusive jurisdiction of the United States government at the time of the admission of Oklahoma into the Union, and that the jurisdiction of the United States government to punish for crimes committed within the boundaries of the Platt National Park was reserved in the act admitting Oklahoma into the Union."

In the opinion it is said:

"The Constitution of Oklahoma acknowledges the sovereignty of the United States over the places named or referred to in the Enabling Act. The state through its legislative assembly had disclaimed any right, title, or interest in and to the lands now embraced in what is known as the Platt National Park, adjoining the city of Sulphur in the county of Murray. Section 8184, C. S. 1921 [Sec. 1225 St. 1931], effective Jan. 27, 1911.

"The laws above quoted show beyond all doubt that the legislative power of Congress is exclusive over lands within the state of Oklahoma, set aside by Congress as a National Park, game preserve or other reservation, and that the United States government has reserved exclusive control and jurisdiction over the same, leaving to the state only the right to serve civil and criminal process,

issued under the authority of the state, on any person amenable to the same within said Sulphur Springs Reservation, national parks, game preserves, and other reservations.

"Courts take judicial cognizance of the territorial extent of the sovereignty and jurisdiction exercised by their own government, and the courts of this state will take judicial notice of the fact that the Platt National Park is owned by the United States government, with exclusive control and jurisdiction, and that crimes committed within its boundaries are beyond the jurisdiction of the state courts."

Counsel for petitioner cite numerous cases involving violation of laws of the United States prohibiting the introduction of intoxicating liquors to the Indian country and prohibiting possession of the same therein, also prohibiting traffic in such liquors with tribal Indians.

It is our opinion that this class of cases have no application to the question under consideration. The power of Congress to prohibit the introduction of intoxicating liquors into an Indian reservation and to prohibit the traffic in such liquors with tribal Indians, whether upon or off a reservation, or whether within or without the bounds of a state, does not admit of any doubt. It arises in part from the clause of the Constitution (article 1, § 8, cl. 3) investing Congress with authority "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," and in part from the recognized relation of Tribal Indians to the federal government.

Our conclusion is that Congress has not reserved to the federal courts the jurisdiction to punish Indians in the Indian Territory for the crimes enumerated in Act of March 3, 1885, even when committed upon a restricted Indian Allotment.

We have no doubt the criminal laws of the state apply to Indians in that part of the state that was formerly the Indian Territory, and that they are not subject to federal law, except in the cases where Congress has so expressly provided, as in the acts dealing with the subject of intoxicating liquors.

For the reasons stated, we hold that the jurisdiction of the state courts, as fixed by the Constitution and laws of the state, extends to the counties of that part of the state that was formerly the Indian Territory. It follows that the district court of Pushmataha county has jurisdiction of all felonious crimes committed within its borders.

We may say in passing that as courts take judicial knowledge of their own records and proceedings, we have carefully examined the record and case-made on the appeal in the case of Nowabbi v. State, supra, and while the proof shows the place of the crime to be in Pushmataha county, we fail to find any evidence establishing or tending to establish that the crime charged was committed on a restricted Indian allotment. And, furthermore, it nowhere appears in said record that the defendant, David Nowabbi, challenged either in the district court or in this court the jurisdiction of said courts. Said record fails to reveal that said petitioner had at any time raised the question or contended that the crime with which he was charged and convicted was committed on a restricted allotment and was one against the laws of the United States, within the exclusive jurisdiction of the federal courts. The question was raised and for the first time presented in his petition for writ of habeas corpus filed in this court.

For the reasons stated, the writ of habeas corpus will be denied. It is so ordered.

EDWARDS, P. J., and DAVENPORT, J., concur.