The Attorney General is in receipt of your request for an opinion wherein you ask, in effect, the following questions: 1. What is the definition of the term "Indian" as it is used in 18 U.S.C.A. 1152 and 1153? 2. Does the restriction of federal jurisdiction over Indians in certain instances, contained in 18 U.S.C. § 1152, paragraph two, preclude application of the "Assimilative Crimes Act,18 U.S.C. § 13? If so, does paragraph two of Title 18 U.S.C.A. 1152 also restrict the application of state traffic offenses under Title 18 U.S.C.A. 13 when committed in Indian Country by an Indian ? 3. Does the above restriction apply if the violation results in an automobile accident with injury to the person or property of another Indian? Does the result differ if the person or property of a non-Indian is injured? 4. Do the district courts of the State of Oklahoma have jurisdiction over traffic offenses committed by non-Indians in Indian County? 5. If a state officer arrests an individual for commission of federal offense what are the officer's obligations in regard to the following: detention of the individual; presentation of the individual before a magistrate; place of presentment; person before whom the arrested individual is to be taken; transportation of arrestee? 6. If a trooper while driving through Indian County observes a violation of state law, but is unable to determine the race of the individual, may the trooper stop the violator? If so, may the trooper pursue the individual should he attempt to elude ? 7. Is the Oklahoma Highway Patrol obligated or required to investigate and report motor vehicle accidents occurring in "Indian Country" within the State of Oklahoma? 8. Does the Financial Responsibility Law of the State of Oklahoma, Title 47 7-101, et seq. apply to accidents occurring within Indian Country, and do the provisions of 47 O.S. 7-601 [47-7-601] through 47 O.S. 7-606 [47-7-606] regarding required insurance, apply to vehicles owned by Indians living in Indian Country ? 9. Do the provisions of 47 O.S. 10-101 [47-10-101] through 40 O.S. 10-117 [40-10-117] requiring reporting of motor vehicle accidents apply within Indian Country? 10. Is there any "Indian Country" in the counties in eastern Oklahoma formerly known as "Indian Territory?" Some of the foregoing questions are directly or indirectly the subjects of pending litigation in the federal courts. Hopefully, these cases originating in Oklahoma will provide some guidance which is now lacking. However, in conformance with the longstanding policy of this office not to write opinions on issues presently pending before any court, we must decline to answer questions 1, 2, 3 and 6. The remaining questions will be addressed in the order presented. A. DO THE DISTRICT COURTS OF THE STATE OF OKLAHOMA HAVE JURISDICTION OVER TRAFFIC OFFENSES COMMITTED BY NON-INDIANS IN INDIAN COUNTRY ? It is well settled that the District Courts of this state have jurisdiction over all crimes committed by non-Indians anywhere in Oklahoma as indicated by a long line of cases from the Supreme Court of the United States. The general rule was set out in United States v. Jack McBratney, 104 U.S. 62226 L.Ed. 869, (1882), in which the Court stated: "The State of Colorado, by its admission into the union by Congress, upon an equal footing with the original states in all respects whatever without any such exception as had been made in the treaty with the Ute Indians and in the Act establishing a territorial government, has acquired criminal jurisdiction over its own citizens and other white persons throughout the whole of the territory within its limits, including the Ute reservation . . ." (Emphasis added) This logic was again followed in the case of Pleasant Draper v. United States, 164 U.S. 240,17 S.Ct. 107, 41 L.Ed. 419 (1896) when the Supreme Court of the United States while following the McBratney case, supra, expanded on its ruling by considering specific limitations in state constitutions and enabling acts. The Court in the Draper case dealt with a provision in the enabling act of that state, which was later ratified by the Montana Constitution which provides as follows: "Second, That the people inhabiting the said proposed State of Montana do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; ' (Emphasis added) It should be noted that the third paragraph of Section three of the Enabling Act of the State of Oklahoma and Article 1, Section 3 of the Oklahoma Constitution are almost exactly the same as the provisions of the Montana Enabling Act and Constitution. The Court, in determining this wording did not reserve exclusive jurisdiction over the Indian lands to the United States. It stated: "As equality of Statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of "Indian lands" does not of necessity signify a retention of jurisdiction in the United States to punish all offenses committed on such lands by others than Indian or against Indians." The Court further stated: "It follows that a proper appreciation of the legislation as to Indians existing at the time of the passage of the Enabling Act by which the State of Montana was admitted into the union adequately explains the use of the words relied upon, and demonstrates that in reserving to the United States jurisdiction and control over Indian lands it was not intended to deprive the State of power to punish for crimes committed on a reservation or Indian lands by other than Indian or against Indians." (Emphasis added) The Court's ruling in United States v. McBratney, supra, was again followed in the case of United States of America v. John Ramsey, 271 U.S. 467, 70 L.Ed. 103946 S.Ct. 559 (1926) where the Court was dealing with a case arising out of the United States Court for the Western District of Oklahoma where the crime of murder had been committed upon the Osage Indian Reservation within the State of Oklahoma. The Court in dealing with the application of the general laws of the United States upon Indian Reservations stated: "The authority of the United States under section 2145 to punish crimes occurring within the State of Oklahoma, not committed by or against Indians was ended by the grant of statehood." The Court further stated: "But authority in respect of crimes committed by or against Indians continued after the admission of the state as it was before." See also United States v. Gabriel Francis Antelope, 430 U.S. 641,51 L.Ed.2d 701, 97 S.Ct. 1395: United States v. Cleveland,503 F.2d 1067 (9th Cir. 1975). It is also interesting to note that even if there were Indian courts upon the reservations or Indian lands that the Indian courts would have no authority to try a non-Indian for crimes committed within the reservation. See Mark David Oliphant v. The Suquamish Indian Tribe, 435 U.S. 191, 55 L.Ed.2d 209,98 S.Ct. 1011. B. IF A STATE OFFICER ARRESTS AN INDIVIDUAL FOR A COMMISSION OF A FEDERAL OFFENSE, WHAT ARE THE OFFICER'S OBLIGATIONS IN REGARD TO THE FOLLOWING: DETENTION OF THE INDIVIDUAL; PRESENTATION OF THE INDIVIDUAL BEFORE A MAGISTRATE; PLACE OF PRESENTMENT; PERSON BEFORE WHOM THE ARRESTED INDIVIDUAL IS TO BE TAKEN; TRANSPORTATION OF ARRESTEE ? The general rule has been that a state peace officer has the duty to arrest without a warrant any person committing an offense against the United States in his presence. U.S. v. Bumbala, 23 F.2d 696
(D.C.N.Y. 1928); In Re Schuetze, 299 F. 827; (D.C.N Y 1924) 299 F. 827; U.S. v. Bowdach, 561 F.2d 1160 (5th Cir. 1977). This general rule is applicable within the State of Oklahoma and any peace officer within the State who observes an offense against the laws of the United States committed within his presence has the present ability to arrest and detain an individual for that violation. It being understood that any prosecution would have to occur in the federal court. Upon making such an arrest, the officer would be obligated to present the arrested person without delay to a magistrate. This magistrate need not be a federal magistrate and the officer may make use of any magistrate within the county of the arrest. Pursuant to Title 18 U.S.C.A. 3041 it would be that magistrates obligation to follow the usual mode of procedure of this state for determining whether the prisoner shall be held for trial or discharged from arrest. In this regard the magistrate is obligated by 18 U.S.C.A. 3041 to comply with Chapter 207 of Title 18 U.S.C. regarding the admitting of a person to bail. C. IS THE OKLAHOMA HIGHWAY PATROL OBLIGATED OR REQUIRED TO INVESTIGATE AND REPORT MOTOR VEHICLE ACCIDENTS OCCURRING IN "INDIAN COUNTRY" WITHIN THE STATE OF OKLAHOMA ? The authority of the Oklahoma Highway Patrol is set out in 47 O.S. 2-117 [47-2-117] (1971). As well as having many other duties and obligations the patrol is obligated under subdivision ten of that section to investigate and report all motor vehicle accidents on the state highway system outside of incorporated municipalities. The statute provides in part as follows: "It shall be the duty of the highway patrol to investigate and report all motor vehicle accidents on the state highway system outside of incorporated municipalities." Emphasis added This being the obligation and duty of the patrol, the nature of the land over which the highway runs would be immaterial providing, of course, that the highway is part of the state highway system. Our conclusion in this regard should not be misinterpreted to authorize troopers to cite Indian violators in "Indian Country" or even to cause Indian violators to be subjected to prosecution in a federal forum. Pending litigation now before the Tenth Circuit Court of Appeals is premised upon the assertion by certain Indian tribes that regulatory type offenses, i.e., crimes unrelated to persons or property, are not incorporated into the law of Indian Country by the "Assimilative Crimes Act," 18 U.S.C.A. 13. Until this issue is resolved, we cannot advise on the authority to cite Indian violators in the course of an investigation the site of which is in "Indian Country." D. DOES THE FINANCIAL RESPONSIBILITY LAW OF THE STATE OF OKLAHOMA, TITLE 47 O.S. 7-202 [47-7-202], ET SEQ. (1971), APPLY TO ACCIDENTS OCCURRING WITHIN "INDIAN COUNTRY," AND DO THE PROVISIONS OF TITLE 47 O.S. 7-601 [47-7-601] -47 O.S. 7-606 [47-7-606] (1971) REGARDING REQUIRED SECURITY, APPLY TO VEHICLES OWNED BY INDIANS LIVING IN INDIAN COUNTRY ? The critical provision of the Financial Responsibility Laws which deals with application of the act is found in 47 O.S. 7-201 [47-7-201] (1971). This section provides as follows: "The provisions of this chapter, requiring deposit of security, the filing of proof of financial responsibility, and suspension for failure to deposit security or file proof of financial responsibility, subject to certain exemptions, shall apply to the driver and owner of any vehicle of a type subject to registration under the Motor Vehicle Laws of this state which is in any manner involved in an accident upon the highways of this state, which accident has resulted in bodily injury to or death of any person or damage to the property of any one person in excess of one hundred dollars ($100.00)." Emphasis added Again, it is clear from reading the statute that this provision applies to all motor vehicles registered in the State of Oklahoma. Therefore, if a vehicle owned by an Indian is registered in the State of Oklahoma, then it must be covered by security of some type as required by 47 O.S. 7-601 [47-7-601] (1971). Furthermore, pursuant to 47 O.S. 7-605 [47-7-605] (1971), if a vehicle owned by an Indian is operated anywhere within the state, including Indian land, then the vehicle must be covered by some type of security as required in 47 O.S. 7-601 [47-7-601] (1971) and if not so covered, the owner of said vehicle would be subject to suspension of his driver's license and registration. E. DO THE PROVISIONS OF 47 O.S. 10-101 [47-10-101] THROUGH 47 O.S. 10-117 [47-10-117] (1971), REQUIRING REPORTING OF MOTOR VEHICLE ACCIDENTS APPLY WITHIN IN DIAN COUNTRY. Title 47 O.S. 10-101 [47-10-101] (1971) provides as follows: "The provisions of this chapter shall apply upon highways, turnpikes, and public parking lots throughout the state." Title 47 O.S. 10-114 [47-10-114] (1971), provides in pertinent part: "The Commissioner of Public Safety may suspend the license or permit to drive and any nonresident operating privileges of any person failing to report an accident as herein provided until such report has been filed, . . ." The reporting obligation and other duties imposed under 47 O.S. 10-101 [47-10-101], et seq. (1971), as amended, are clearly related to the privilege of holding a license or permit to operate a motor vehicle within this state. All who seek such privileges must abide by the terms of the grant of privilege or suffer possible loss thereof. The requirements of the law are in no way related to an individuals status as an Indian or the locality where the privilege is exercised. Failure to comply with the provisions of the law expose the licensee to potential suspension of the license which would have effect anywhere within the state. F. IS THERE ANY "INDIAN COUNTRY" IN THE COUNTIES IN EASTERN OKLAHOMA FORMALLY KNOWN AS "INDIAN TERRITORY ?" In order to determine the nature of the land lying in Eastern Oklahoma formally known as "Indian Territory," one must consider the history behind the creation of Oklahoma. Prior to the creation of the Oklahoma Territory, the entirety of what is now the State of Oklahoma was known as "Indian Territory." During that time, exclusive jurisdiction to matters both civil and criminal was vested in the Indian tribes and federal courts. At that time, there was very little statutory law governing this particular territory and what there was, excluded Indians from its application. On May 2, 1890, Congress passed an act which provided for a temporary government for the, Territory of Oklahoma and enlarged the jurisdiction of the United States Court in the Indian Territory. 26 Stat 81. Section 12 of that act provided that the District Courts in the "Territory of Oklahoma" had jurisdiction in controversies between Indians of different tribes or nations but did not grant any jurisdiction in controversies arising between Indians of the same tribe while they sustained their tribal relations. This section did not grant any specific jurisdiction to the Tribal Courts. By close reading of 29, 30, and 36 of that act, (26 Stat 81) we find that the Indians in the "Indian Territory," (better known as the "Five Civilized Tribes") were treated differently in that they continued to exercise exclusive jurisdiction of all civil and criminal cases arising in the country in which members of the nation by nativity or adoption were the only parties and excluded the application of the laws of Arkansas over this type of controversy. (''6 Stat 81 30) However, in 1897 Congress passed an act (30 Stat 83) which provides in part as follows: ". . . that on and after January first, eighteen hundred and ninety-eight, the United States Courts in said Territory shall have original and exclusive jurisdiction and authority to try and determine all civil causes in law and equity thereafter instituted and all criminal causes for the punishment of any offense committed after January first, eighteen hundred and ninety-eight, by any person in said Territory, and the United States commissioners in said Territory shall have and exercise the powers and jurisdiction already conferred upon them by existing laws of the United States as respects all persons and property in said Territory; and the laws of the United States and the State of Arkansas in force in the Territory shall apply to all persons therein, irrespective of race, said courts exercising jurisdiction thereof as now conferred upon them in the trial of like causes; and any citizen of anyone of said tribes otherwise qualified who can speak and understand the English language may serve as a juror in any of said courts." As a result of this act, jurisdiction of all crimes and offenses within the "Indian Territory," i.e., the Eastern one half of the present State of Oklahoma, was vested in the United States (territorial) courts, and the laws of Arkansas applied to all persons within the Territory. Chronologically, the next act passed by Congress was Public Law #149, (34 Stat 182) which amended the Allotment Act of 1897, (24 Stat 388) and by the amendment excluded "all Indians in the Indian Territory" from application of the allotment act. Throughout the Allotment Act (24 Stat 388) and its subsequent amendments, Congress speaks of the Indians adopting the habits of civilized life, or becoming civilized and one apparent justification for the exclusion of the "Five Civilized Tribes" from the Allotment Act was that Congress felt these Indians had reached the point where they were civilized and thus would not have to be under the close guardianship or supervision of the government. The only case that we have found that deals with the jurisdiction over those lands formally known as "Indian Territory" is the case of Ex Parte Nowabbi, Okl.61 P.2d 1139(12). The Nowabbi case arose when Nowabbi, an Indian, was convicted of murdering another Indian on an Indian allotment in Pushmataha County, within the State of Oklahoma. The defendant sought relief through a writ of habeas corpus to the Court of Criminal Appeals of the State of Oklahoma. The Court of Criminal Appeals in denying the writ came forth with an exhaustive dissertation concerning the jurisdiction of the State Courts over Indian lands within the state. The Court noted that the congressional legislative treatment of the "Oklahoma Territory" and the "Indian Territory" was different and that while the state had no jurisdiction over Indian lands contained within the former "Oklahoma Territory" the state did, however, have jurisdiction over all lands within the former "Indian Territory." The Court relied basically upon the final provision of Title 27 U.S.C.A. 349, which provides as follows: ". . . and provided further, that the provisions of this act shall not extend to any Indians in the former Indian Territory." The Court in dealing with this provision stated: "We think the obvious purpose of the final and explicit proviso of said act was to take the Indians in the Indian Territory out of the category of Reservation Indians. And it shows a clear and unmistakable intention on the part of Congress to limit the jurisdiction of the United States over allotments in the Indian Territory." The Court in the Nowabbi case cited the case of Higgins v. Brown, Judge,20 Okl. 355, 95 P. 703 (1908), where the Supreme Court of Oklahoma held: ". . . and indictment for the crime of murder alleged to have been committed within the jurisdiction of the United States Court for the northern district of the Indian Territory, and pending in said court on the admission of the State into the union is cognizable in the district court of the State, as its successor, in the county in which the offense was committed." The Court as authority for its position found that Congress made no specific reservation as to jurisdiction or control over Indian lands in the former "Indian Territory" and as such, no reservation could be implied. The Court cited the long list of United States Supreme Court cases dealing with the specific wording, or lack thereof, as being tantamount to no reservation at all. While the Oklahoma Enabling Act made a specific reservation as to the Platt National Park, there were no other exclusive reservations as to jurisdiction on Indian land. The Court in conclusion stated: "Our conclusion is that Congress has not reserved to the Federal Courts the jurisdiction to punish Indians in the Indian Territory for the crimes enumerated in Act of March 3, 1885, even when committed upon a restricted Indian Allotment. We have no doubt the criminal laws of the state applied to Indians in the part of the state that was formally the Indian Territory and that they are not subject to federal law, except in the cases where Congress has so expressly provided, as in the acts dealing with the subject of intoxicating liquors." The Enabling Act, 34 Stat. 267, which made provision for the entrance of Oklahoma as a State of the Union, contained two specific references to the lands of Indians within the area comprising the new state. While these provisions might, at first, appear inconsistent with the decision of the Court in Nowabbi, supra, we shall demonstrate later herein why they are not. Sections 1 and 3 of the Enabling Act, state in pertinent part: "Section 1 . . . provided, that nothing contained in the said constitution shall be construed to limit or impair the rights of person or property pertaining to the Indians of said territories (so long as such rights shall remain unextinguished) or to limit or effect the authority of the government of the United States to make any law or regulation respecting such Indians. their lands, property or other rights by treaties, agreement, law or otherwise, which it would have been competent to make if this act had never been passed. Emphasis added "Section 3 . . . that the people inhabiting said proposed state do agree and declare that they forever disclaim all right and title in or to any unappropriated lands lying within the boundaries thereof and to all lands lying within said limits owned or held by an Indian, tribe, or nation; and that until the title to any such public land shall have been extinguished by the United States the same shall be and remain subject to the jurisdiction, disposal and control of the United States." Emphasis added As previously discussed, the Indian Nations of "Indian Territory" and the Osage Tribe of Indians were the subject of special con gressional legislation relative to the allotment of tribal lands. As these tribes were generally deemed by Congress ready for full citizenship, a congressional attitude not extended to the Indian Tribe of "Oklahoma Territory," efforts were undertaken to wind up tribal affairs as separate political entities before statehood. These efforts were not entirely successful due to some reluctance on the part of various dissident Indians to participate in the allotment process. Congress took steps to solve the problem. The Curtis Act of 1906, April 26, 1906, 34 Stat. 137, was the Congressional solution to the problem. The membership rolls of all Five Civilized Tribes were to be closed. Provisions were made "for the final disposition of the affairs of the Five Civilized Tribes in Indian Territory." The authority of the tribal governments to tag was abolished. Provision was made for the "dissolution of the tribal governments" upon the completion of the allotment process and the sale of unallotted tribal lands. The reference in Section 1 of the Enabling Act to the limitation or impairment of its rights of persons or property pertaining to the Indians so long as such rights shall remain unextinguished. The Curtis Act of 1906 had as its express purpose the dissolution and extinguishment of the Five Civilized Tribes as governmental entities. The process of allotting lands and selling unallotted lands was not completed until after statehood. Thus, the inclusion in both the Enabling Act and the State Constitution, Article I, Section 3, of the provisions respecting Indian property and rights. Also, in both the former Indian and Oklahoma Territories individual Indians had property rights which continued to exist under the protection of the United States. The property rights of individual Indians in both Oklahoma and Indian Territories have been preserved by federal and state law. The existence of the various Indian Tribes of Oklahoma as governmental entities is not questioned. With respect, however, to the Five Civilized Tribes, the Osage Tribe and all other tribes of Indians in former Indian Territory, specific Congressional action was taken to dissolve those tribes as governmental entities. Their tribal courts are the direct judicial antecedents of our present state district courts in former Indian Territory. Their municipal and governmental offices and agencies became, for the most part, local government of the cities and counties of Eastern Oklahoma. All tribal government in former Indian Territory merged with and became a part of state government of the State of Oklahoma. While there certainly are individual allotments still held under restrictions against alienation in Eastern Oklahoma, there is no "Indian Country" as that term is used in federal law because there are no tribal governments still endowed with limited sovereignty in the area comprising former Indian Territory. Therefore, it is the official opinion of the Attorney General that your questions be answered as follows: A. The district courts of this state have jurisdiction over all traffic offenses committed by non-Indians regardless of where in the state the alleged offense took place. B. State officers have a duty to arrest any perpetrator of an offense against the laws of the United States committed in the officers presence, and transport the alleged offender without delay to a magistrate. C. Officers of the State Highway Patrol are obligated to investigate and report all motor vehicle accidents for the state highway system outside of incorporated municipalities regardless of the fact the scene of the motor vehicle accident may be "Indian Country." D. No motor vehicle, regardless of the race or residence of the owner, may be registered in Oklahoma absent compliance with Oklahoma's Financial Responsibility Laws (47 O.S. 47-7-101 [47-47-7-101], et seq., and 47 O.S. 7-601 [47-7-601], et seq. (1971), as amended). E. The entitlement of any person, regardless of race or place of residence, to a motor vehicle operator's license or permit includes the obligation to report motor vehicle accidents and the failure to report motor vehicle accidents could result in the loss of an individuals operators license or permit. F. Due to the dissolution of the Indian tribes of former "Indian Territory" as governments of limited sovereignty, there is no "Indian country" in said former "Indian Territory" over which tribal and thus federal Jurisdiction exists. (JOHN F. PERCIVAL) (ksg)Disposition: ** SEE: OPINION NO. 79-213A (1979) **